## THE STATE ex rel. JOHN W. HALLIBURTON v. CORNELIUS ROACH, Secretary of State.

### In Banc, August 15, 1910.

### ON MOTION TO DISMISS.

1. MANDAMUS: To Submit Amendment to Constitution: Interest of Petitioner. Any taxpaying citizen who is a qualified voter of the State, although he has not signed the petition asking the Secretary of State to submit, under the initiative amendment to the Constitution, an amendment to the Constitution to be voted on by the people at the next general election, has the same right as any other citizen to bring suit by mandamus against said officer, to compel him to receive, accept and file said petition and submit in legal way the said amendment to be voted upon in accordance with said petition; and any such citizen, being a qualified voter, has such an interest as a citizen as to authorize him to maintain such suit.

2. ———: ———: ———: Moot Question. Nor is the mandamus case to compel the Secretary of State to file the petitions and submit the proposed measure a moot one, but one of vital importance to the people.

3. ———: Against Administrative Officers: Jurisdiction. The Supreme Court, under the Constitution, has original jurisdiction in mandamus proceedings to compel administrative State officers to perform administrative or ministerial acts.

4. ———: ———: ———: ———: Vested in Circuit Court. The fact that the statute (Laws 1909, pp. 554 to 564) provides that any citizen may make application to the Cole County Circuit Court for a writ of mandamus in the particular case, does not deprive the Supreme Court of the original jurisdiction conferred upon it by the Constitution to compel administrative State officers to perform administrative or ministerial duties. That statute conferred no jurisdiction on the circuit court it did not already have.

### ON THE MERITS.

1. INITIATIVE PETITION: Senatorial Districts: Statutory Enactment. A petition demanding that an amendment to the Constitution be submitted to the people dividing the State into senatorial districts does not in fact ask for an amendment to the Constitution, but for a statutory enactment by popular vote.

State ex rel. v. Roach.

·2. ——: ——: ——: **By Attempt to Amend Constitution.** A statute cannot be enacted by the people under the initiative clause of the Constitution, by an attempt to amend the Constitution. A petition filed with the Secretary of State demanding that a proposition be submitted to the people amending section 11 of article 4 of the Constitution, which section was legislative in character, was self-terminating and has had no legal existence since 1881, and dividing the State into 34 senatorial districts and declaring what counties should compose each until the year 1920, asks only for the enactment by the people of a statute, although it denominates itself an amendment to the Constitution.

3. ——: ——: ——: ——: **In Conflict with Other Parts of Constitution.** A statute enacted by the people at a general election under the initiative clause of the Constitution, although it claims to be an amendment to section 11 of article 4 of the Constitution, namely, a statute dividing the State into senatorial districts, would be invalid and could never go into force until section 7 of said article 4 is amended, since said section 7 says that the General Assembly, at its first session after the taking of the decennial United States census, shall divide the State into senatorial districts, or, in case of its failure to do so, certain State officers shall make such division, and said statute does not pretend or purport to amend said section 7. Before the State can be divided into senatorial districts by the people said section 7 must be amended; and a statute dividing the State into senatorial districts and an amendment to said section 7 of article 4 of the Constitution cannot go along together and be made by the one and same vote of the people. Nor can a petition, containing a proposed amendment to the Constitution, declaring, as a part of the legislative act dividing the State into senatorial districts, that hereafter the State may be divided into senatorial districts by either the General Assembly or the people through initiative vote, be held to be sufficient as an amendment to the Constitution unless it contain the full text of the proposed amendment, and it does not contain the full text if it omits all reference to section 7 of article 4.

4. ——: ——: **Constitutional Amendment or Statute: Right of Secretary of State to Determine.** When a petition is presented to the Secretary of State demanding that he submit to the people for their adoption a purported amendment to the Constitution, he has the right to determine, by an inspection of its subject-matter, whether it is a petition for a constitutional amendment or a petition for the enactment of a statute. A mere designation of itself as a constitutional amendment does

not make it such, and is not binding on the Secretary of State. He has no right to submit as a constitutional amendment a proposition which is clearly a statutory enactment. Nor has he the right to submit as an amendment to the Constitution a proposition on the filing of a petition which does not contain the full text of the amendment proposed, and a petition to amend section 11 of article 4, and to divide the State into senatorial districts, and omitting all reference to section 7, which declares how the State shall be divided into senatorial districts, does not contain a full text of the proposed amendment.

5. ———: ———: ———: ———: **Constitutional Question.** The Secretary of State cannot pass upon the constitutionality or unconstitutionality of a proposed statutory enactment when petitions are presented to him demanding that he submit the same to the people for their approval or disapproval at the next general election, under the initiative amendment to the Constitution; but he has the right and the discretion, when such petitions are presented to him, to determine whether, as a fact, they demand an amendment to the Constitution or a legislative enactment; and if their clear purpose is manifestly to enact a statute under the disguise of an amendment to the Constitution, his duty is to reject them.

6. ———: **Legal Sufficiency: Jurisdiction of Courts.** The legal sufficiency of petitions submitted to the Secretary of State under the initiative clause of the Constitution is under the supervision of the courts; and the courts are not restricted to a determination of the one fact of whether or not they have been signed by the requisite number of voters, but may determine whether or not the measure embraced in the petition comes within the purview of the initiative amendment to the Constitution—for instance, if the petition demands an amendment to the Constitution the court may determine whether or not it contains the full text of the amendment proposed. The initiative amendment to the Constitution does not mean that petitions may be presented upon any and all subjects regardless of whether or not they fall within the class of subjects contemplated by it.

7. ———: **Secretary of State: Part of Legislative Department.** The Secretary of State is not a part of the legislative department in the submission of a constitutional amendment or a statutory enactment to the people under the initiative amendment to the Constitution. If he were that, he could not be reached by the courts, either by mandamus or injunction, for the courts cannot compel or enjoin the legislative department. But he is, as to all elections, a ministerial officer, and as such

is invested with a certain discretion, as are other administrative officers, but a wrongful exercise of that discretion may be corrected by the courts. [Per GRAVES, J., in separate concurring opinion.]

8. ———: **Sufficiency of Petition: Discretion of Secretary of State.** Both under the initiative-and-referendum amendment to the Constitution and the Act of 1909, the Secretary of State has power to determine the legal sufficiency of a petition presented to him for a popular vote on the measure embraced therein, but in a determination of its sufficiency he acts as a ministerial officer, and the courts have jurisdiction, by mandamus, to correct an abuse of his discretion in the matter. [Per GRAVES, J., in separate concurring opinion.]

9. ———: **Constitutionality of Act.** *Held*, by WOODSON, J., dissenting, that the courts have no power to determine the validity of a proposed statute or constitutional amendment, to be submitted to the people, until after it has been approved by them—any more than they have to enjoin a proposed bill in the Legislature, however offensive to the Constitution it may be. And what the courts cannot do directly they cannot do indirectly—they cannot control the people themselves from voting upon an invalid act, and therefore they cannot reach the same result indirectly by upholding the Secretary of State in his refusal to submit the proposed measure to the people.

### Mandamus.


Writ denied.


*John C. Brown, John Kennish, C. C. Madison* and *Homer Hall,* counsel for W. S. Dickey, appearing for signers of the petition.

(1) The powers and duties of the Secretary of State in receiving and filing petitions as defined by the Initiative and Referendum Act are purely ministerial. The act clearly distinguishes between the petitions submitting a measure and the measure itself. If the petitions are legally sufficient, that is, if they are signed by the required number of qualified voters, and are properly verified and are in substantially the form required by the act, then the Secretary of State

should have performed his plain ministerial duty of accepting and filing them when they were offered to him for that purpose. The petition in this case alleges that the petitions presented to respondent were sufficient and complied with all the requirements of the law. The respondent's return does not deny or controvert those allegations, and this court should issue its peremptory writ as prayed. Laws 1907, p. 452; Laws 1909, p. 554. (2) The respondent had no authority to refuse to file the petitions for the reason that the proposed amendment to the Constitution was unconstitutional, and this court will not pass upon the unconstitutionality of the proposed amendment while it is in a formative stage and before it has been adopted by a vote of the people. 16 Am. and Eng. Ency. Law, 423; Albright v. Fisher, 164 Mo. 56; State ex rel. v. Allen, 180 Mo. 27; Kansas City v. Hyde, 196 Mo. 506; Jaicks v. Merrill, 201 Mo. 104; State ex rel. v. Thorson, 9 S. D. 154; People ex rel. v. Mills, 70 Pac. (Colo.) 322; Clayton v. Calhoun, 76 Ga. 270. (3) Courts are not required to pass on the constitutionality of laws before they are enacted. State ex rel. v. Gibson, 195 Mo. 251. (4) The vesting of power in the Governor, Attorney-General and Secretary of State to redistrict the State after the census of 1910 shall be completed and published, is not a contract with said officers, and the people may resume such power at their pleasure. All political power is inalienably vested in the people, and although temporarily granted to agents, it may be recalled at pleasure, even though to do so would oust from office persons elected under its provisions. Constitution of 1875, art. 2, secs. 1 and 2; State v. McBride, 4 Mo. 187; State ex rel. v. Bermondy, 40 Mo. 193; Edwards v. Lesueur, 132 Mo. 433. A highly respectable precedent for the proposed amendment is the Constitution of 1875. The Constitution of 1865 had prescribed a basis whereby the Legislature could have redistricted the State senatorially after the census was

taken by the State in 1876, but before that date arrived the people, through their Constitutional Convention, redistricted the State without regard to any census whatever, and at a time when and in a manner the former Constitution did not authorize. Constitution of 1865, sec. 4, art. 7; R. S. 1879, p. 52; Laws 1866, p. 3; Laws 1875, p. 3. (5) The objection that the amendment is legislative in character is without merit. Even though the State could be redistricted by the Legislature or certain State officers, this is no reason why the people, through a constitutional amendment, cannot perform the same act. There is no line of demarcation which excludes the people from doing what they have authorized or may authorize their agents to do. 6 Am. and Eng. Ency. Law (2 Ed.), p. 890; Edwards v. Lesueur, 132 Mo. 433. "The character, that is, the substance and extent of the amendments, is left entirely and exclusively to the discretion of the General Assembly. The right to propose is as unlimited as the right to adopt by vote of the people themselves." If further illustration were necessary to prove that the people always reserve the power to do all things which their agents may do, we will refer to the matter of prohibiting the sale of intoxicating liquors. This court has repeatedly said that the Legislature has power to prohibit the sale of liquors. State ex rel. v. Hudson, 78 Mo. 302; State ex rel. v. Pond, 93 Mo. 623; State v. Bixman, 162 Mo. 21. Yet it is held by all the State courts and Federal Supreme Court that the same end may be accomplished by constitutional amendment. The objection that the proposed amendment is legislative in character, and is, therefore, invalid, is without support both in principle and precedent. For in our Constitution there are many provisions as specific in detail and in requirements imposed as any statute could be. Edwards v. Lesueur, 132 Mo. 410. (6) Whenever the issues in a cause can be properly disposed of without considering the con-

stitutional questions raised, such constitutional questions will be ignored. State ex rel. v. Walker, 132 Mo. 210; Baker County v. Benson, 40 Ore. 207. (7) For at least thirty years it has been the custom in our State to submit to the people more than one proposition in the same constitutional amendment where the matters submitted are germane to each other. For instance, in 1884 an amendment submitted to the people: First, a proposition to extend the jurisdiction of the St. Louis Court of Appeals from four counties to approximately half the State; second, to create the Kansas City Court of Appeals; third, to authorize the Legislature to create a third court of appeals; fourth, to fix the salaries of the judges of the Court of Appeals; fifth, to give the Supreme Court superintending control over courts of appeals. All five of these propositions could have been submitted separately, yet no lawyer in the State doubts that they were properly submitted as one amendment. Laws 1883, p. 215. In 1890 an amendment submitted to the voters the following proposition: First, to increase the number of judges of the Supreme Court from five to seven; second, to divide the court into two divisions, and granting to a majority of each division the power to try and decide cases; third, to vest in Division Two of said court. consisting of only three members, exclusive jurisdiction of appeals in criminal cases; fourth, to vest in the Governor power to appoint two additional judges. All four of these propositions could have been submitted separately and with just as much propriety as to submit the amendment in controversy as two separate propositions. To sustain this objection to the proposed amendment means the nullification of practically all the amendments adopted to our State Constitution in the last thirty years. In the case of Russell v. Croy, 164 Mo. 95, this court said that it would hesitate to disturb a method of submitting amendments which had been followed for ten years, and we submit that this

alone furnishes sufficient ground for rejecting the objection of respondent now under consideration. (8) If the proposed amendment submits two incongruous or disconnected propositions, it would be invalid, though adopted by vote of the people. This is well settled law. However, this amendment simply proposes to redistrict the State and to furnish or prescribe a basis for changing the districts hereafter, and the two subjects, if they could be segregated at all, are so closely allied and so absolutely germane to each other that it is entirely appropriate to submit both in one proposition. Gabbert v. Railroad, 171 Mo. 84; State ex rel. v. Timme, 54 Wis. 318; State ex rel. v. Bronson, 115 Mo. 271; State ex rel. v. Miller, 100 Mo. 439; Lynch v. Murphy, 119 Mo. 163. (9) The fact that a constitutional amendment may be repugnant to and in conflict with other provisions of the Constitution will not render such amendment invalid. 6 Am. and Eng. Ency. Law (2 Ed.), p. 927; People ex rel. v. Angle, 109 N. Y. 575; State v. Langworthy, 104 Pac. 424; 8 Cyc. 749, 750.

*Elliott W. Major,* Attorney-General, *John M. Dawson, John M. Atkinson, Chas. G. Revelle* and *James T. Blair,* Assistant Attorneys-General, for respondent.

(1) The redistricting of the State into senatorial districts is legislative and not constitutional in its nature and is not the subject of a constitutional amendment. (a) 1. The amendment proposed is not the subject of a constitutional amendment. It is purely a legislative act, temporary in its nature. The courts, both State and Federal, as well as text writers on constitutional subjects, define a Constitution as follows: "A Constitution is in fact a fundamental law or basis of government. It is a rule as contradistinguished from a temporary or sudden act. Permanent, uniform and universal." 1 Story, sec. 339; Ware v. Hylton, 3 Dall. 199; Livermore v. Waite, 102 Cal. 118. The diversity between matters constitutional and legislative is dis-

tinctly recognized by the initiative and referendum amendment to the Constitution, since it expressly provides for the proposal and adoption of legislative measures as well as amendments to the Constitution. In fact, this idea runs through the entire Constitution and permeates every section thereof. 2. Only a plan or method for redistricting the state is a subject for fixed and permanent rules and principles, while the matter of actual redistricting is a subject of only temporary arrangement. It is something that must be altered or changed with the ever changing population, and is entirely beyond the pale of the present constitutional scheme, but clearly and exclusively within that of legislative action. Nor can the power to amend the Constitution be expanded into a power to propose for insertion in that instrument something wholly beyond the constitutional plan and wholly legislative in character. Livermore v. Waite, supra; Jameson on Const. Conv., secs. 570, 540, 551. 3. The mere act of dividing the State into senatorial districts is a legislative act. It is made so by the Constitution of this State in section 7 of article 4. It is there provided that the redistricting shall be done by the Legislature. It was recognized as a legislative act by the adoption of section 11, article 4, of the Constitutional Convention in 1875, which convention provided that it should cease to have life as a part of the Constitution in the year 1881 and in accordance with the provisions of section 7 of article 4. It served its legislative purpose as declared by the Constitutional Convention of 1875, and ceased to have life in 1881. The proposed so-called constitutional amendment itself recognizes that the act of redistricting into senatorial districts is a legislative one to begin with and leaves it as a legislative one at the end in 1920—that it is only temporary, not permanent. (b) The proposition that the so-called amendment is merely a legislative measure necessarily leads to the conclusion that in so far as it seeks to actually

redistrict the state into senatorial districts, it is violative of section 7, article 4 of the Constitution. A law proposed by the people must as necessarily conform to the existing requirements of the Constitution as must a law passed by the people. Kadderly v. Portland, 44 Ore. 146. The power to redistrict the State into senatorial districts is, by section 7, article 4 of the Constitution, specifically and exclusively delegated to the Legislature, and, in event of its failure to act, to certain officials therein named. It is in its very nature, as well as by the express terms of the Constitution, a legislative power, yet it was, and is, a power which, being still specifically delegated, cannot be exercised by any authority other than that named, and this condition was, and is, not changed, modified or affected by the adoption of the initiative and referendum amendment. That portion of the proposed amendment by which it is sought to redistrict the State, amounts to an execution of the power now exclusively vested in the Legislature and certain named officials. That portion providing for future changes can, by its own terms, have no force or effect until 1920, and must be so construed. State ex rel. v. Timme, 54 Wis. 329; Answer of the Judges, 3 Gray (Mass.) 602. (2) The State cannot be redistricted into new senatorial districts, by the initiative, until the power delegated to the Legislature so to do by the people is first resumed by a repeal of section 7, article 4, of the Constitution. Both cannot be done at the same time. (a) 1. Conceding, for the moment, that the whole of the proposed amendment is of a constitutional nature, and is a proper subject of a constitutional amendment, still, that part of the amendment which seeks to actually redistrict the State, is violative of section 7, article 4 of the Constitution. This section, which is still in force, and which will be in full effect on the day of the election when the electors cast their ballots, specifically provides how

the State shall be redistricted, and by what departments it shall be done. This, in effect, is an absolute prohibition against the redistricting being done in any other way, or by any power other than the Legislature, or the officials therein named. State ex rel. v. Barnes, 24 Fla. 32. 2. How can it be sanely contended that the people can redistrict the State through the guise of a proposed amendment, when at the time they act and vote to redistrict, they are prohibited by the Constitution from redistricting, or voting to redistrict? Jameson on Constitutional Conventions, p. 581, sec. 551. The people are as much bound by the Constitution which they adopt as are the various departments of government, and after they have expressly renounced a power and delegated it to certain departments to be exercised exclusively by such departments, they cannot themselves exercise that power until it has been resumed in the manner pointed out by the Constitution. Will it be argued that, since the redistricting of the State by the proposed amendment is violative of the provisions of section 7, article 4, it therefore, and by implication, repeals that section, and the redistricting would stand? This seems to be relator's theory, but it is clearly untenable. 3. We unhesitatingly concede, in fact, assert, the power of the people to recall the power to redistrict, which is now lodged elsewhere, and to vest it, by proper action, where the people see fit, but this cannot be done by exercising the power in violation of the instrument by which they have exclusively lodged it elsewhere. Before the power can be exercised it must be resumed. The doctrine of repeal by implication, while applicable to constitutional provisions, has no effect on this phase. If the people directly resume the power now lodged in the Legislature and certain officials, or, if they expressly place the power in different hands, this, after the adoption of such an amendment, would repeal by implication section 7, article 4, but this section cannot be repealed merely by

violating it, as the proposed amendment attempts.
4. How can you proceed to do a thing before the right
or authority so to do attaches? The right could not
possibly attach until it was ascertained that the amend-
ment was ratified or adopted on a canvass of the votes.
State v. Kyle, 166 Mo. 301; R. S. 1899, sec. 7124;
Laws 1909, p. 557, secs. 7 and 8.   (b) The proposed
amendment, in so far as it attempts to redistrict the
State, contravenes section 7, article 4, of the Constitu-
tion in another respect. This section provides that the
apportionment shall be revised and adjusted and the
State redistricted upon the basis of the decennial census
of the United States. This is a specific manner and
method for determining the apportionment, and is the
sole basis upon which the redistricting of the State
can be constitutionally done. The decennial census of
the United States has not yet been officially deter-
mined, and the proposed apportionment is not based
upon any census or rule recognized by the Constitution,
but upon a basis impliedly prohibited. The proposed
amendment does not give the voters an opportunity to
redistrict the State upon a constitutional basis, but re-
quires them to refrain from voting, or to vote in favor
of or against an apportionment which is arbitrarily
fixed upon a basis of political advantage rather than
upon a basis constitutional. Concede, for the moment,
that the people have the right to redistrict the State—
what right have they to ignore and violate this pro-
vision of the Constitution? (3) The proposed amend-
ment is invalid because it conjoins two distinct proposi-
tions. 1. That portion of section 2 of article 15 of
the Constitution which provides that amendments shall
be submitted separately is as applicable to this amend-
ment as to those proposed by the Legislature. Norton
v. Broadham, 21 S. C. 382; Cummings v. Spaunhorst, 5
Mo. App. 21; People ex rel. v. Rice, 135 N. Y. 496.
2. "It is well settled that a Constitution adopted by
the people can only be changed, modified or amended

in the manner provided by the instrument itself."
Russie v. Brazzell, 128 Mo. 167; Edwards v. Lesueur,
132 Mo. 433; Gabbert v. Railroad, 171 Mo. 105. The
question whether, there being several amendments,
they were submitted so that the voters could vote sep-
arately on each, was fundamentally vital. Oakland v.
Hilton, 69 Cal. 489; State v. Foraker, 46 Oh. St. —;
People v. Hawkins, 175 N. Y. 12; State ex rel. v. Allen,
186 Mo. 674; State ex rel. v. Wilder, 200 Mo. 103;
State ex rel. v. Wilder, 217 Mo. 269; State ex rel. v.
Gordon, 223 Mo. 1. 3. That there are two distinct
propositions embraced in the amendment proposed for
submission does not admit of two opinions. One branch
of the proposed amendment consists of a proposed re-
districting of the State. The other is designed to pro-
vide for a change in the method of exercising the power
of redistricting in the future. (4) It is the duty
of the Secretary of State to refuse to file proposed
amendments if they are not in legal form, and the duty
of the court to decide that question on application for
mandamus. Cooley on Const. Lim. (7 Ed.), p. 892;
Livermore v. Waite, 102 Cal. 113; Edwards v. Lesueur,
132 Mo. 410. Unless the petitions comply with the legal
requisites, the Secretary of State cannot be compelled
to file them. State ex rel. v. Russell, 124 Wis. 549.
And the question whether a constitutional amendment
is in proper form for submission must be raised prior
to the vote upon such amendment. Bott v. Secretary
of State, 63 N. J. L. 302; State v. Wurts, 63 N. J. L.
294. It is universally held that the question whether
a proposed amendment to a State Constitution has been
legally adopted is a question for the courts, and that
if a court determines that an amendment has not been
proposed, submitted and adopted in conformity to the
requirements of the Constitution of the State, it is the
duty of such court to hold that such proposed amend-
ment has not become a part of the Constitution and
deny it any validity—despite the fact that it may have

received a majority vote. See cases cited under point three. Relator has no right to mandamus unless he can put his finger on the "thus saith the law," which entitles him to have the act performed of which performance has been refused. State ex rel. v. McIntosh, 205 Mo. 635; State ex rel. v. Bridge Co., 206 Mo. 134; Kirchgenner v. Board of Health, 56 N. J. L. 596. It was expressly held in the case of Holmberg v. Jones, 7 Idaho, that the ballot can be and should be purged of improper submissions. Cooley's Const. Lim. (7 Ed.), 71.

## ON MOTION TO DISMISS.

FOX, C. J.—On July 11, 1910, Mr. Walter S. Dickey, through his attorneys, asked leave to file a motion to dismiss this proceeding. This leave was granted, and the motion to dismiss was, in accordance with the directions of this court, duly filed by the clerk.

We have given to this motion, as well as the suggestions in support of it, our most careful consideration. In our opinion this court has jurisdiction of this proceeding.

Counsel for Mr. Dickey urge, first, that this is a collusive or moot case and is not founded upon any real or existing controversy between the relator, John W. Halliburton, and the respondent, Cornelius Roach. It is sufficient upon that proposition to say that Mr. Halliburton is a citizen of this State and a qualified voter, and notwithstanding he may not have signed the petitions as presented by Mr. Dickey to the Secretary of State, yet as a citizen and a voter he has as much interest and the same right to institute this proceeding as any citizen who may have signed such petitions. As to this proceeding being a moot case there is nothing upon the face of the proceeding to indicate such fact, and the motion that alleges that it is a moot case has not been sworn to by either Mr. Dickey or

his counsel.  But aside from all this it is perfectly manifest that this is a live proceeding—one of vital importance to the people of this State, and should be determined as speedily as possible.  If under the Constitution and laws of this State, the petition should be filed and the question of the amendment to the Constitution dividing the State into senatorial districts be submitted to the vote of the people of Missouri at the next general election, then this court, upon the hearing of this cause, will unhesitatingly so declare.  On the other hand it necessarily follows that if under the Constitution and laws of this State there is no authority for submitting such constitutional amendment, this court will so announce such conclusion.

Second.  As heretofore indicated, in our opinion the relator, Mr. Halliburton, in this proceeding, being a qualified voter, has such an interest as a citizen of this State as to authorize him to maintain this cause.

Third.  Under the Constitution of this State, article 6, section 3, this court has original jurisdiction in mandamus proceedings to compel administrative State officers to perform administrative and ministerial acts, and the mere fact that the statute (Laws 1909, pages 554 to 564), provides for an application by any citizen to the Cole County Circuit Court, falls far short of depriving this court of the jurisdiction conferred upon it by the Constitution of this State.  In fact it was unnecessary for the Legislature to make the provision that any citizen might maintain a suit by mandamus in the Cole County Circuit Court, for the reason that that could be done in the absence of any statute; the Secretary of State residing here, the Cole County Circuit Court would have jurisdiction of a proceeding of that character.

Entertaining these views the motion will be overruled; however this being a question of such vital importance we most cheerfully give our consent to counsel for Mr. Dickey to file briefs and make oral argument

in this proceeding at 9 o'clock a. m. on Tuesday, the 19th of July. *Gantt, Burgess, Woodson* and *Graves, JJ.,* concur; *Valliant* and *Lamm, JJ.,* absent.

## ON MERITS.

FOX, C. J.—This is an original proceeding in this court in which it is sought by the relator, John W. Halliburton, to have this court issue its peremptory writ of mandamus against the Secretary of State, the respondent, compelling him to file certain petitions presented to him, submitting an amendment to the Constitution at the next general election in this State.

The petition alleges that the relator, John W. Halliburton, is a resident taxpaying citizen of Jasper county and a qualified voter in the present Twenty-Eighth Senatorial District of Missouri; and that respondent, Cornelius Roach, is the Secretary of State of the State of Missouri. It is also alleged in the petition that on July 7, 1910, Walter S. Dickey and Rush C. Lake presented a large number of petitions for a proposed amendment to the Constitution, to be voted upon at the next general election, in pursuance of the present initiative amendment to the Constitution. It is alleged in the petition that there was the necessary number of petitioners from the various portions of the State to authorize the filing of the petitions.

The initiative petitions as filed by Walter S. Dickey and Rush C. Lake, in part are as follows:

"To the Honorable Cornelius Roach, Secretary of the State of Missouri:

"We, the undersigned, citizens and legal voters of the State of Missouri, and county of — — — —, respectfully demand that the following proposed amendment to the Constitution of Missouri, shall be submitted to the legal voters of the State of Missouri, for their approval or rejection, at the regular general election to be held on the 8th day of November, A. D.

1910, and each for himself says: I have personally signed this petition; I am a legal voter of the State of Missouri and of the county of ————; my residence and postoffice are correctly written after my name." (Here follow signatures).

The proposed amendment, leaving out the description and boundaries of the proposed new senatorial districts sought to be created thereby, reads:

"Proposed Amendment to the Constitution of Missouri.

"To be submitted to the legal voters of the State of Missouri for their approval or rejection at the regular general election to be held on the Tuesday next following the first Monday in November, A. D. 1910, providing for striking out and annulling section 11 of article 4 of the Constitution of Missouri, and enacting and adopting a new section, to be known as section 11 of article 4, which is in words and figures as follows:

"Section 11, Article 4. The senatorial districts of the State shall hereafter be constituted and numbered as follows: . . . . . .

"This division of the State into senatorial districts shall continue until the United States census of 1920 shall have been taken and the result thereof as to this State ascertained, when the districts shall, by a law enacted by the people or passed by the General Assembly, be revised and adjusted on the basis of that census, and every ten years thereafter, upon the basis of the United States census, the districts shall be revised and adjusted by a law enacted by the people or passed by the General Assembly."

By appropriate averments it is charged in the petition by the relator that the petitions as presented by Mr. Dickey and Mr. Lake, as herein indicated, were presented to the Secretary of State with the request that they be filed in accordance with the statute authorizing the filing, and that the Secretary of State refused to file the same.

This court, upon the petition as presented by the relator, issued its alternative writ of mandamus returnable on the 19th day of July, 1910. In the interim between the issuance of the alternative writ and the return day of such writ Mr. Walter S. Dickey, through his counsel, asked leave to file a motion to dismiss this proceeding. This motion, upon the direction of the court, was filed by the clerk, and, after due consideration, was overruled, for the reasons as indicated in the opinion filed, which is officially reported in connection with this opinion.

Respondent, Cornelius Roach, through the Attorney-General, has filed a return to the alternative writ awarded by this court, in which return numerous grounds are assigned in support of the action of the Secretary of State why said petitions by the initiative tendered by Mr. Dickey and Mr. Lake should not be filed. We do not deem it essential to encumber this statement by setting out in detail the different reasons assigned by the respondent in support of his action in declining to file the petitions. The grounds assigned in the return of the respondent will be given such attention during the course of the opinion as their importance demands and merits.

Upon the invitation of the relator, and with the consent given by this court, counsel for Messrs. Dickey and Lake have joined with the relator in the presentation of the questions involved in this proceeding, and have filed a motion for judgment upon the pleadings.

This sufficiently indicates the nature and character of this controversy to enable us to determine the legal propositions disclosed by the record before us.

## OPINION.

The record before us in this proceeding instituted by the relator discloses two controlling propositions which are submitted to us for consideration.

First: Were the petitions as presented to the respondent, Secretary of State, legally sufficient to authorize the submission to the voters of this State of an amendment to or change in the organic law (the Constitution) of this State? Or, in other words, do the petitions embrace in fact a demand for the submission of a constitutional amendment within the contemplation and purview of the initiative amendment adopted in this State in November, 1908, as well as the legislation approved June 12, 1909, providing for the carrying out of such initiative amendment to the Constitution?

Second: Under the provisions of the initiative amendment to the Constitution and the legislation enacted by the General Assembly of this State, approved June 12, 1909, can the respondent, the Secretary of State, if the subject-matter as embraced in the petitions does not fall within the purview of the initiative and referendum amendment to the Constitution, as well as the legislation enacted for the purpose of carrying out the provisions of such constitutional amendment, decline to accept and file the petitions as presented by Messrs. Dickey and Lake? In other words, has the Secretary of State a discretion where the subject-matter of the petitions is foreign to what was contemplated by the initiative and referendum amendment to decline to file such petitions?

These are the propositions with which this court is confronted. The questions presented are purely questions of law and the rules applicable to the interpretation of constitutional and statutory provisions should not and will not be extended or relaxed for the purpose of reaching a conclusion either making the writ peremptory or absolutely denying it; but the correct solution of the important propositions which are presented for our consideration must be sought alone by the fair, impartial and reasonable interpretation of the initiative provisions of the Constitution and the

legislation duly passed by the General Assembly in reference to carrying out its provisions.

I.

Directing our attention to the first proposition in reference to the nature and character of the petitions as presented to the Secretary of State for acceptance and filing by Messrs. Dickey and Lake, and as to whether or not, upon the face of such petitions, an amendment to the Constitution of this State is sought to be voted upon by the people at the next general election, it is well to keep in mind the initiative and referendum provision of the Constitution adopted by the people in 1908, as well as the legislation passed by the General Assembly by an act approved June 12, 1909, providing for the carrying out of the provisions of such initiative amendment.

Again, in the correct solution of this proposition the Constitution and law of this State as it exists now must not be overlooked, for the reason that it is the changing of the Constitution and law as it now exists applicable to the division of this State into senatorial districts that was uppermost in the minds of those who presented for acceptance and filing the petitions to the respondent.

Section 7 of Article 4 of the Constitution, which is now in force, provides: "Senators and representatives shall be chosen according to the rule of apportionment established in this Constitution, until the next decennial census by the United States shall have been taken, and the result thereof as to this State ascertained, when the apportionment shall be revised and adjusted on the basis of that census, and every ten years thereafter upon the basis of the United States census; or if such census be not taken, or is delayed, then on the basis of a State census; such apportionment to be made at the first session of the General Assembly after each such census: Provided, that if

at any time, or from any cause, the General Assembly shall fail or refuse to district the State for senators, as required in this section, it shall be the duty of the Governor, Secretary of State and Attorney-General, within thirty days after the adjournment of the General Assembly on which such duty devolved, to perform said duty, and to file in the office of the Secretary of State a full statement of the districts formed by them, including the names of the counties embraced in each district, and the numbers thereof; said statement to be signed by them, and attested by the Great Seal of the State, and upon the proclamation of the Governor, the same shall be as binding and effectual as if done by the General Assembly.''

It is now the settled law of this State that the senatorial districts have been divided and their boundaries specifically defined in accordance with the provisions of the Constitution last above cited, and the people of this State fully recognized the validity of such law, and in the election of their senators conformed to its provisions.

This leads to the inquiry as to the course to be pursued in order to change the manner and method of dividing the senatorial districts of this State. Directing our attention to the initiative amendment to the Constitution adopted at the election held November 3, 1908, we find that the people of this State ratified an amendment to the Constitution which provided a different method by which amendments to the Constitution might be voted upon and by which laws might be enacted. This amendment to the Constitution substantially provides that the legislative authority of the State shall be vested in a legislative assembly, consisting of a Senate and House of Representatives, but the people reserve to themselves power to propose any measure, either laws or amendments to the Constitution, and to enact or reject the same at the polls, independent of the legislative assembly, and

the power was also reserved to the people to approve or reject at the polls any act of the legislative assembly. This amendment also provided for a certain per cent of the legal voters in each of at least two-thirds of the congressional districts in the State to sign petitions for the submission of amendments to the Constitution or laws that were desired to be enacted. It will be observed that this constitutional amendment expressly required that the petitions should include the full text of the measure so proposed. In other words, the initiative amendment adopted in 1908 requires that if an amendment to the Constitution is desired the full text of that amendment shall be embraced in the petition; or if a law is to be enacted by the initiative the full text of the measure shall also be incorporated in the petition. It will also be observed that the initiative amendment to the Constitution of 1908 expressly provides that "this section shall not be construed to deprive any member of the legislative assembly of the right to introduce any measure." In other words, if by the initiative a law was adopted by a vote of the people, this would not prevent any member of the Legislature from introducing a measure and having it passed, if he could secure the sufficient number of votes, to repeal such law and enact certain other measures in substitution for those repealed.

This brings us to the consideration of the petitions as presented for acceptance and filing to the Secretary of State. While these petitions are named and called a "proposed amendment to the Constitution of Missouri," yet we take it that the allegations of the petitions and what is shown upon the face of them must finally determine their nature and character, that is, whether or not it is in fact an amendment to the Constitution or is purely a legislative act. The petitions in substance suggest a proposed amendment to the Constitution of Missouri "to be submitted to the legal voters of the State of Missouri for their approval or rejection,

at the regular general election to be held on Tuesday next following the first Monday in November, A. D. 1910, providing for striking out and annulling section 11 of article 4 of the Constitution of Missouri, and enacting and adopting a new section, to be known as section 11 of article 4, which is in words and figures as follows:'' Then follows the new section of the Constitution, styled section 11 of article 4, that ''the senatorial districts of this State shall hereafter be constituted and numbered as follows:'' Following this is a designation of the counties which shall constitute the new division of the senatorial districts, and following this the proposed constitutional amendment says that ''this division of the State into senatorial districts shall continue until the United States census of 1920 shall have been taken and the result thereof as to this State ascertained, when the districts shall, by a law enacted by the people, or passed by the General Assembly, be revised and adjusted on the basis of that census, and every ten years thereafter upon the basis of the United States census, the districts shall be revised and adjusted by a law enacted by the people or passed by the General Assembly.''

That this proposed constitutional amendment is but a purely legislative enactment, in our opinion, is too plain for argument, and will only require a moment's consideration to convince the most skeptical upon that subject. In the first place these petitions contain the remarkable provision ''providing for striking out and annulling section 11 of article 4 of the Constitution of Missouri.'' It is but common knowledge that section 11 of article 4 of the Constitution of Missouri was self-terminating and has had no existence since the year 1881. It was embraced in the Constitution, as is well known, for a temporary purpose, and its existence was limited until appropriate provisions could be made for the organization of the State into proper senatorial districts. Then follows what is

termed a proposed constitutional amendment, which consists of a mere division of the State into senatorial districts in a different method from that existing under the Constitution and laws of this State. In other words, it is sought by the petitions, as presented to the Secretary of State, to enact a law dividing the senatorial districts in a different way from that in which they are divided under the present existing law. Not one word is suggested in the petitions as to any change or amendment to section 7 of article 4 of the Constitution of this State, which fully provides how the senatorial districts shall be divided; hence we have, if the contentions of learned counsel presenting this case for the relator are maintained, the anomalous proposition that while the power to divide the senatorial districts in this State is lodged in section 7 of article 4 of the Constitution, yet by a purely legislative enactment such power as is lodged in the constitutional provision might be taken away by a legislative enactment providing for the exercise of power, and absolutely dividing this State into districts without any change whatever or amendment to the constitutional provision.

Manifestly before the senatorial districts can be divided in the manner as suggested in the so-called proposed constitutional amendment, section 7 of article 4 of the Constitution of this State must be amended and so changed as to authorize, by the initiative, the people at the polls to divide the senatorial districts. Section 7 of article 4 of the Constitution, in addition to providing how the senatorial districts shall be divided, expressly provides that the apportionment shall be revised and adjusted every ten years upon the basis of the United States census, or if such census be not taken, or is delayed, then on the basis of a State census; such apportionment to be made at the first session of the General Assembly after each such census. Clearly it will not be seriously contended that the senatorial districts might be altered and changed in the manner

suggested by the so-called amendment to the Constitution without first submitting to the people of the State an amendment to section 7 of article 4 of the Constitution, which expressly provides how the senatorial districts shall be divided. If this can be done we again have the anomalous proposition that upon the day of the election we have a Constitution (section 7, article 4) in full force, providing how the senatorial and representative districts shall be divided, and without a single change in the constitutional provision, or a single suggestion as to a different method of dividing the senatorial and representative districts, and without any vote by the people under the initiative making any change in the constitutional provision, or any canvass or return of such vote, an absolute exercise of the right to divide the State into senatorial districts. Manifestly, as heretofore stated, the right to alter and change the senatorial districts as suggested in this so-called proposed constitutional amendment could not possibly attach until it was ascertained that section 7 of article 4 of the Constitution of this State had been amended and that such amendment was ratified or adopted upon a proper canvass and return of the votes. In other words, the exercise of the power by the initiative to alter and divide the senatorial districts by a legislative enactment cannot have the force and effect of dislodging the power vested by the Constitution under section 7 of article 4, providing for the apportionment of senatorial districts. Before the power to alter and divide the senatorial districts can be exercised there must be an appropriate amendment to the Constitution dislodging the power to so divide and alter such districts under the present Constitution and laws of this State.

The line of demarkation between a constitutional amendment and a purely legislative act is well defined. That eminent author, Mr. Story, in his 1st volume, section 339, thus gives expression to his views as to the meaning of a Constitution. It is there said: "A Con-

stitution is in fact a fundamental law or basis of government. . . . . It is a rule, as contradistinguished from a temporary or sudden order; permanent, uniform, and universal." The Supreme Court of the United States, in Ware v. Hylton, 3 Dall. 199, used this language: "A constitution of a State is a fundamental law of a State." Constitutional provisions and amendments to the Constitution relate to the fundamental law and certain fixed first principles upon which government is founded. Constitutions are commonly called the organic law of a State. The purpose of constitutional provisions and amendments to the Constitution is to prescribe the permanent framework and a uniform system of government, and to assign to the different departments thereof their respective powers and duties.

In Livermore v. Waite, 102 Cal. 1. c. 118, the meaning of the term "constitution" was clearly pointed out, and it was there said: "The very term 'constitution' implies an instrument of a permanent and abiding nature, and the provisions contained therein for its revision indicate the will of the people that the underlying principles upon which it rests, as well as the substantial entirety of the instrument, shall be of a' like permanent and abiding nature."

The distinction between constitutional provisions and legislative acts is distinctly and clearly recognized by the initiative and referendum amendment to the Constitution, for it is there that we find express provisions for the proposal and adoption of legislative measures as well as amendments to the Constitution. The distinction between legislative acts and constitutional provisions or amendments to the Constitution is clearly emphasized when we consider their force and effect after being adopted through the initiative, as provided by the Constitution. A legislative act, as distinguished from a constitutional amendment which

is adopted through the initiative, has only the force
and effect of a statute enacted by the Legislature, and
is subject to and may be repealed by the lawmaking
power—the Legislature; but when an amendment to
the Constitution is adopted by the same method, that
is, through the initiative, its force and effect is entirely
of a different nature and character for the reason that
it is not subject to and cannot be repealed by the Leg-
islature.   A constitutional provision or amendment
applicable to redistricting the senatorial districts of
this State simply points out a plan or method for such
redistricting, and   prescribes permanent   rules   and
principles for carrying out such method or plan.   On
the other hand, the matter of actually redistricting is a
subject of a very temporary character.   It is well
known that population forms the basis of fixing the
boundaries of senatorial districts, and these districts
must be altered and changed in harmony with the
changes that are constantly going on in population,
and it was never contemplated under our present con-
stitutional scheme to incorporate as a part of the per-
manent and fundamental law of the State a provision
which must of necessity demand frequent alterations
and changes.    The petitions themselves as presented
to   the   respondent   clearly   indicate   that   the   so-
called   constitutional    amendment   is   nothing   more
nor less than a temporary   legislative   act.    After
pointing out the respective counties that shall consti-
tute the senatorial districts, it expressly avers that
"this division of the State into senatorial districts shall
continue until the United States census of 1920 shall
have been taken and the result thereof as to this State
ascertained."   Following this is an express allegation
that after the result of the United States census of
1920 shall have been ascertained, the districts as di-
vided under this so-called constitutional amendment
shall, "by a law enacted by the people, or passed by
the General Assembly, be revised and adjusted on the

basis of that census, and every ten years thereafter, upon the basis of the United States census, the districts shall be revised and adjusted by a law enacted by the people or passed by the General Assembly.''

Manifestly these allegations mark this so-called constitutional amendment as purely a legislative act. The life of this so-called constitutional amendment is limited to a comparatively short period, that is to say, until 1920, and then the power to revise and adjust the districts on the basis of the United States census of 1920 is again restored to the Legislature or the people under the initiative amendment. In other words, the constitutional provision now in force, section 7, of article 4, delegating the power to divide and define the senatorial districts by this so-called proposed constitutional amendment, is completely repealed and annulled without the faintest suggestion or intimation in this so-called proposed amendment that the present Constitution, now in full force, is to be amended in any way or repealed or annulled. This clearly indicates the temporary character of the measure proposed, as well as its purpose to get rid of the present constitutional provision by the enactment of a law, called a constitutional amendment. This cannot be done without a compliance with the initiative amendment which expressly requires the full text of the amendment to the Constitution to be included in the petition. We, therefore, repeat that the petitions in this case do not propose, within the purview of the Constitution and laws of this State, an amendment to the Constitution.

Obviously in determining the nature and character of the measure proposed in the petitions presented to the respondent we must look to the subject-matter with which they deal. The mere calling it an amendment to the Constitution, unless the subject-matter verifies the correctness of that name, is not binding either upon the respondent or upon this court. As heretofore indicated, a mere play upon words and the providing for

the striking out and annulling of section 11 of article 4 of the Constitution of Missouri, a section of the Constitution that has had no life or vitality for over a quarter of a century, cannot have the force and effect of making the proposal a constitutional amendment.

As heretofore stated, section 11 of article 4 was inserted in the Constitution of 1875 for purely a temporary purpose. It was inserted to meet a temporary necessity and provide a temporary arrangement until the legislative measure provided by the Constitution could be placed in operation and make provision for the accomplishment of the purpose especially assigned to it upon the subject of forming the senatorial districts. The fact that section 11 of article 4 was placed in the Constitution of 1875 for a temporary purpose and that such purpose was clearly indicated by the makers of the Constitution, emphasizes the view that the makers of the Constitution fully recognized the legislative nature of the act of redistricting which from necessity had to be incorporated in the Constitution. The life of this legislative section was limited to the time when legislative action could be taken in pursuance of a plan and method for dividing the senatorial districts in pursuance of a permanent provision of the Constitution which is in force at the present time.

The rules and principles applicable to the submission of constitutional amendments to the voters of this State are applicable alike to amendments proposed to the Constitution under the initiative and referendum amendment or amendments to the Constitution proposed by the General Assembly of this State. Whichever course is pursued in submitting the amendment it must in fact be an amendment to the Constitution. If submitted through the initiative, manifestly that provision contained in the initiative and referendum amendment that "the petition shall include the full text of the measure so proposed," must be complied with. In other words, if it is truly an

amendment to the Constitution the full text of the amendment and what provision of the Constitution it undertakes to amend must be embraced in the petition. If submitted by the General Assembly manifestly the resolution submitting a constitutional amendment must embrace the full text of the amendment sought to be adopted.

As heretofore stated we have in force at the present time, section 7 of article 4 of the Constitution of this State prescribing the plan and method of redistricting the senatorial districts. If the contentions of learned counsel associated with the relator in this proceeding are to be maintained then the result of the proposed constitutional amendment must be to repeal section 7 of article 4 of the Constitution of this State, as well as dislodge the power delegated by such provision of the Constitution to the General Assembly to make the division of senatorial districts in this State. This manifestly is the purpose sought, yet we have what is denominated a constitutional amendment that makes no reference whatever to any change or alteration in the provision of the Constitution which is in force now and which specifically treats of the subject with which the so-called proposed constitutional amendment deals. If this is the purpose, and beyond dispute it is, then in our opinion it must logically follow that the so-called proposed constitutional amendment is not an amendment to the Constitution within the purview of the provisions of the initiative and referendum provision of the Constitution, and deals with a subject that is entirely foreign to the subject of an amendment to the provision of the Constitution which treats of the matter of dividing the senatorial districts in this State.

If the petitioners or those presenting the petitions to the respondent desire to change the method of redistricting this State into senatorial districts under and through the provisions of the initiative and refer-

endum amendment to the Constitution, the course to be pursued is plainly marked by the initiative provision— as provided by the initiative provision, they must include in such petitions the full text of the measure so proposed. In other words, as applicable to this subject, they must include in the petitions the full text of the amendment that is desired to be made as to section 7 of article 4 of the Constitution of this State changing and altering the method and plan of redistricting the senatorial districts, and instead of delegating the power to the General Assembly, and in the event of its failure to perform the duty to certain designated officials, that such districts shall be divided by a law enacted through the initiative and referendum providing for the division of such senatorial districts. After having amended the Constitution in this manner then the way is perfectly clear to propose through the initiative, not a constitutional amendment, but a legislative act dealing with the subject of dividing and defining the boundaries of the senatorial districts in this State. This course, which is clearly contemplated by the initiative and referendum amendment, was not pursued in the petitions presented to the respondent, but instead of including in their petitions the full text of a constitutional amendment, as heretofore indicated, there are presented to the respondent petitions denominating the subject a proposed constitutional amendment, which, in our opinion, is nothing more nor less than an effort to enact a purely legislative act providing for the exercise of a power which is otherwise delegated under the Constitution and laws of this State. As heretofore stated, the measure proposed is entirely foreign to an amendment to the Constitution which deals with the subject embraced in the petitions presented. The initiative and referendum amendment to the Constitution speaks of laws and amendments to the Constitution. Manifestly those terms are used in their plain and ordinary sense, and in our opinion the

petitioners have no right to undertake to put in the Constitution, which is regarded as the organic and permanent law of the State, mere legislative acts providing for the exercise of certain powers.

We are unwilling to give our assent to the contention that these petitions should have been accepted and filed, whether or not they were applicable to a subject or a matter contemplated by the initiative and referendum.

## II.

This brings us to the consideration of the second proposition, that is, can the respondent, the Secretary of State, under the provisions of the initiative amendment to the Constitution and the legislation enacted by the General Assembly of this State, approved June 12, 1909, if the subject-matter as embraced in the petitions does not fall within the purview of the initiative and referendum amendment to the Constitution, as well as the legislation enacted for the purpose of carrying out the provisions of such constitutional amendment, decline to accept and file the petitions as presented by Messrs. Dickey and Lake? In other words, has the Secretary of State a discretion, where the subject-matter of the petitions is foreign to what was contemplated by the initiative and referendum amendment, to decline to file such petitions?

Directing our attention to this proposition, it is sufficient to say that we have fully indicated our views in the first paragraph of this opinion that the petitions as presented to the respondent, Secretary of State, for acceptance and filing, by Mr. Walter S. Dickey, were not in fact the presentation of a petition by and through the initiative amendment to the Constitution of a proposed amendment to the Constitution, and that such petitions under the guise of presenting a constitutional amendment in fact simply presented a legislative act. Hence, in our opinion, the petitions pre-

sented to the respondent for acceptance and filing did not present a constitutional amendment within the purview of and as contemplated by the initiative and referendum amendment to the Constitution. In other words, the petitions are not legally sufficient for the reason, not only that the subject dealt with in the petitions is not the proposal of a constitutional amendment, but for the further reason that the petitions do not include, as is expressly provided in the initiative and referendum amendment, the full text of any measure which can be construed to be an amendment to the Constitution dealing with the subject of dividing this State into senatorial districts, and in our opinion the respondent was not authorized to file such petitions, and his action finds full support in the reasons herein indicated, and upon the additional ground that the proposed measure is entirely foreign to a constitutional amendment dealing with the subject of dividing this State into senatorial districts.

Our conclusions upon this proposition, to which we have heretofore given expression, are not based upon the idea that has been suggested in this proceeding that the Secretary of State can pass upon the constitutionality or unconstitutionality of certain legislation, but upon the broad ground that the measure as proposed is in fact and in truth not a constitutional amendment and the full text of a proposed measure which can in any way be construed to be a constitutional amendment is not, as expressly provided by the initiative and referendum amendment, embraced or included in the petitions as presented to the respondent. That the legal sufficiency of the petitions as presented to the Secretary of State is under the supervision of the courts dealing with the subject is fully recognized by the provisions of section 4 of the Act of the General Assembly concerning the filing of petitions, approved June 12, 1909. This section provides: "If the Secretary of State shall refuse to accept and file

any petitions for the initiative or for the referendum, any citizen may apply, within ten days after such refusal, to the circuit court for a writ of mandamus to compel him to do so. If it shall be decided by the court that such petition is legally sufficient, the Secretary of State shall then file it, with a certified copy of the judgment attached thereto, as of the date on which it was originally offered for filing in his office. On showing that any petition filed is not legally sufficient, the court may enjoin the Secretary of State and all other officers from certifying or printing on the official ballot for the ensuing election the ballot title and numbers of such measure. All such suits shall be advanced on the court docket, and heard and decided by the court as quickly as possible. Either party may appeal to the Supreme Court within ten days after a decision is rendered. The circuit court of Cole county shall have jurisdiction in all such cases." [Laws 1909, p. 556.]

It does not furnish a satisfactory answer to this proposition to say that the term "legal sufficiency" of the petition, as embraced in section 4, above quoted, is to be limited alone to the sufficiency of the number of signers to the petitions and their qualifications to sign; its legal sufficiency must be determined by the entire petition. In fact it is manifest that the initiative and referendum amendment expressly requires that the full text of the measure shall be included in the petition, with the view that the signers of the petition may have full knowledge of what they are signing and that the Secretary of State upon the presentation of the petition may determine whether or not the measure embraced in the petition is such a measure as falls within the purview of and is contemplated by the initiative and referendum amendment. The provisions of section 4 can only be construed as meaning what the plain terms of the statute indicate. The statute itself in no way undertakes to limit the application

of the term "legal sufficiency," and the statute making no limitations that term must be applied in harmony with the fully recognized rule of determining the sufficiency of an instrument—that is, in determining its sufficiency the entire instrument must be looked to.

We have implicit confidence in the intelligence of the people of this State and are unable to reach the conclusion that, when they adopted the initiative and referendum amendment in 1908 as a part of the organic law of this State, they contemplated that petitions might be presented upon any and all subjects regardless of whether or not they fall within the class of subjects contemplated by the initiative amendment, such as in fact would constitute constitutional amendments and laws desired to be enacted through the initiative and referendum.

There is no controversy in this proceeding as to the validity of the initiative and referendum amendment to the Constitution, but we are unwilling to say that the office of Secretary of State shall be made the dumping ground of petitions of every nature and character which in fact do not fall within the purview of the initiative amendment; nor was it ever contemplated by the people that such petitions should be filed when such amendment to the Constitution was adopted and ratified.

As stated in the first paragraph of this opinion it will not answer satisfactorily the requirements of the law to merely name a proposition a constitutional amendment. Its nature and character must be determined by the subject-matter with which the petition deals.

We are of the opinion, as is expressly stated by the statute, that the legal sufficiency of the petitions presented are matters subject to review by the courts having jurisdiction of the questions. It was conceded in oral argument by learned counsel presenting this

case upon the part of the relator that the opinion of this court in which it was announced that under the Constitution this court had jurisdiction of mandamus proceedings of this character, was correct, therefore we take it that this court might rightfully assume jurisdiction of the matters involved in this proceeding and determine the propositions presented for our consideration.

In reaching the conclusions upon the propositions as discussed in the first and second paragraphs of this opinion we are not unmindful of the authorities to which our attention has been directed by learned counsel for relator. We have carefully considered all of the citations, but limiting this opinion within reasonable bounds prevents giving expression to our full review of the authorities cited. It is sufficient to say that, after a full and careful consideration of all the authorities cited by learned counsel which in any way tend to support their contentions, the constitutional provisions and the laws with which the court in the cases cited were dealing, clearly distinguish them from the case at bar; therefore, they furnish no support to the contentions so earnestly urged by the learned counsel upon the propositions involving the interpretation of the initiative and referendum amendment to the Constitution of this State and the Act of the General Assembly approved June 12, 1909, which was passed in aid of carrying out the provisions of the initiative and referendum amendment. A careful analysis of the authorities cited by counsel for relator clearly demonstrate that they are entirely dissimilar to the propositions with which we are confronted.

If by calling a measure in a petition filed with the Secretary of State a proposal for a constitutional amendment, regardless of whether or not the subject-matter proposed is entirely foreign to the subject of an amendment to the Constitution, is all that is required to deprive the Secretary of State of the authority of de-

clining to file such a petition, then we confess that at this advanced age of our civilization and with the experience of three-quarters of a century in the administration of the government of this State we have truly reached an extremely novel and most remarkable position in the administration of the affairs of this great commonwealth.

We have given expression to our views upon the two leading and controlling propositions disclosed by the record in this proceeding, which results in the conclusion that the respondent, for the reasons herein indicated, properly declined to file the petitions as presented by Mr. Dickey, and that the peremptory writ of mandamus should be denied and the alternative writ quashed, and it is so ordered. *Gantt* and *Burgess, JJ.,* concur; *Graves, J.,* concurs in separate opinion; *Lamm, J.,* dissents; *Woodson, J.,* dissents in separate opinion; *Valliant, J.,* absent.

## SEPARATE CONCURRING OPINION.

GRAVES, J.—I. I fully concur in all that Fox, C. J., has written in this case. The points made by him are unanswerable, but in the argument and in the briefs another point was raised upon which I have well defined views. With these views I feel that I would be remiss in duty did I not mention them, and this is the reason for a separate concurring opinion. The opinion written by the Chief Justice is sufficient to dispose of the case, but in my judgment does not fully cover the point I have in mind. By counsel for Mr. Dickey it was contended in brief and argument that under the initiative and referendum provision in our Constitution the Secretary of State was a mere cogwheel in the legislative department. That under such circumstances this court could not interfere with the acts of a co-ordinate branch of the government. In this the relator argues too much. We think that his position is untenable, and his idea of the status of the

Secretary of State is wrong. We can better illustrate
our individual views by granting, for argument's sake,
the position of relator and counsel for Mr. Dickey.
They urged in the argument that respondent, in so
far as his conduct of filing initiative petitions is con-
cerned, was to be considered as a part of the
legislative or lawmaking power; that the Secre-
tary of State, in such conduct, was but a cog-
wheel in and a part of the legislative department; that
for such reasons this court could not mandamus him;
that the act, being legislative in character, belonged
to another of the three departments of government,
and this court was thereby precluded from action. If
such be the status of the Secretary of State the con-
tention is well founded. We recognize that a court can-
not compel by mandamus the legislative power to act
upon a given proposed law. We recognize that a court
cannot enjoin the legislative power from enacting
a proposed law, although the proposed measure
may be violative of constitutional provisions. Now,
if the Secretary of State, in this particular
matter, is legislating or acting as a legislative
agent, then what have we? The courts cannot man-
damus him, nor can they enjoin him. The sweet
will of the Secretary of State decides, without redress,
the fate of any proposed measure. If he be a cog-
wheel of the legislative department, he, like a Legisla-
ture, may refuse to act, and the courts are powerless.
Not only are the courts powerless, but the people, the
real legislators under the initiative and referendum,
are powerless. The contention, that the Secretary of
State in the filing of a petition is more than a mere
ministerial administrative officer, when thought out, re-
duces itself to an absurdity. If his acts are beyond
the reach of this court through mandamus, they are
beyond the reach of a circuit court by either mandamus
or injunction. When you place the status of the Sec-
retary of State upon any other basis than that of a

ministerial, administrative or executive officer, you give him absolute control of what shall and what shall not be submitted to the people. The argument, therefore, that such officer, as a part of the legislative department, cannot be reached by the courts, falls of its own weight. His acts are but ministerial in connection with an election to be held. The election of course is one with reference to a proposition, rather than one with reference to a person, but his duties pertaining to such election are ministerial in the one as well as in the other. Because he has been made the officer with whom petitions must be filed does not change the character of his duties from those imposed upon him by the old primary law and other laws. The fallacy of relator's position lies in the fact that he would have the Secretary of State considered, in this matter, as a part of the legislative department. Most ministerial and administrative officers are clothed with more or less discretion, but a wrongful exercise of that discretion may be reached by the courts. The Secretary of State is possessed with discretion. [State ex rel. v. Lesueur, 103 Mo. l. c. 262.] That the courts will control such discretion under given conditions appears by the following among a dozen other cases: State ex rel. v. Public Schools, 134 Mo. l. c. 304-307; State ex rel. v. Goodier, 195 Mo. l. c. 560; State ex rel. v. Adcock, 206 Mo. 550.

If the counsel for Mr. Dickey earnestly believe that Roach, the respondent, is a cog-wheel in the legislative department, then their appearance in this court was uncalled for and detrimental to their own interests. If we conclude that he performed a duty otherwise than the usual duties imposed upon him concerning elections, and as a ministerial officer, then his act in refusing to file the petitions is final in this, as well as all future cases. Such was never the intent of the people when they adopted the initiative and referendum amendment in 1908, and such was not the construction

placed thereon by the Legislature in 1909. This we discuss more fully in a succeeding paragraph.

II. The Act of 1909, Laws 1909, p. 554, is a clear legislative declaration of the character of the duties of the Secretary of State under the Initiative and Referendum Amendment. The amendment itself sufficiently declares the character of his duties. But take the legislative construction first. The constitutional amendment provides that the petition, both for the initiative and the referendum, shall be filed with the Secretary of State. Section 4 of the Act of 1909 carrying out this constitutional mandate, provides that if the Secretary of State shall refuse to accept and file such petitions "any citizen may apply, within ten days after such refusal, to the circuit court for a writ of mandamus to compel him so to do." This statutory provision, however, as indicated in the opinion on the motion to dismiss, does not deprive this court of its constitutional power to issue writs of mandamus in these cases. Such was conceded by leading counsel for Mr. Dickey. Further on it is provided that if the court shall find "that any petition filed is not legally sufficient, the court may enjoin the Secretary of State and all other officers" from placing the measure upon the official ballot. It thus appears that the Legislature never thought that the Secretary of State was beyond the reach of the courts. This Act of 1909 very properly recognizes that the acts of the Secretary of State are ministerial, with some discretion to be exercised by him. The Legislature clearly had no idea that the Secretary of State was a part of the legislative department of government, and therefore above and beyond the courts. This section also says that if the court decides that the petition "is legally sufficient" then the Secretary of State shall be directed to file the same, but if "not legally sufficient" the court shall enjoin the Secretary of State and all other officers from placing the same upon the official

ballot. From this it is clear that there is a duty en-
joined upon the Secretary of State to examine into the
legal sufficiency of these petitions and to file or not file
them as his discretion dictates. From his ruling or ac-
tion redress is left to the courts. In this connection it
should also be remembered that under the Constitution
the measure itself is a part of the petition. It says
"every such petition *shall include the full text of the
measure so proposed."* The italics are ours. So that in
determining the sufficiency of the petition, both the
courts and the Secretary of State have to consider, in a
way, the proposed measure. This because it must be in-
cluded in the petition. We do not mean to say that
either the Secretary of State or the courts should hold
the petition bad on the sole ground that the measure
was unconstitutional, because it is not necessary to pass
upon that question for a full determination of this case.
Let the evils of the hour be determined during the
hour. But this is adrift. Going back to the question
as to the status of the Secretary of State in initiative
and referendum proceedings we find that the first lines
of section four recognize that the Secretary of State,
in the exercise of his discretion, might refuse to file
some petitions, and throughout this entire section is
strong legislative construction adverse to the conten-
tion of learned counsel for Mr. Dickey. Not only does
the Act of 1909 recognize that the Secretary of State
is a ministerial officer, rather than a cog-wheel in the
legislative department, but the initiative and referen-
dum amendment itself does not look upon him other-
wise. As to an election upon referred laws, the elec-
tion may be ordered in two ways, (1) by the Legisla-
ture itself, or, (2) by the Secretary of State upon the
receipt of proper petitions. The Constitution reads:
"The second power is the referendum, and it may be
ordered (except as to laws necessary for the immediate
preservation of the public peace, health or safety and
laws making appropriations for the current expenses

of the State government, for the maintenance of the State institutions and for the support of public schools) either by the petition signed by five per cent of the legal voters in each of at least two-thirds of the congressional districts in the State, or by the legislative assembly, as other bills are enacted. Referendum petitions shall be filed with the Secretary of State not more than ninety days after the final adjournment of the session of the legislative assembly which passed the bill on which the referendum is demanded.''

It is clear that the referendum power may be put in motion by either the Secretary of State or the Legislature, but it will be observed that certain kinds of laws cannot be referred. Does not this contemplate that the Secretary of State shall examine the petitions and see that the petition is sufficient under the Constitution and laws? Suppose a petition for a reference of the lawmaking appropriation for the current expenses should be presented to the Secretary of State, is it to be said that he could not refuse to file such a petition? Is there not a power there for him to judge as to the sufficiency of the petitions under the exceptions in the Constitution itself? The same applies to laws as to the public peace, health and public institutions. Are these laws to be suspended until action by the people or has the Secretary of State some discretion? Clearly the latter. The legal sufficiency of the petition is determined from an examination of the petition and the attached measure, which is a part thereof. An examination of the law and the Constitution forces me to the conclusion that the functions of the Secretary are those of a ministerial officer, with the usual discretions lodged in such officer, and not those of a cog-wheel in the legislative department. As above stated, and as shown by the cases cited, the abuse of discretion can be reached by the courts. I therefore have no doubt that this court is fully possessed of jurisdiction, and that

the writ should be denied upon the grounds stated in the opinion of Fox, C. J., and it may be upon other points made. *Fox, C. J., Gantt* and *Burgess, JJ.,* concur in these views also; *Lamm* and *Woodson, JJ.,* dissent; *Valliant, J.,* absent.

## DISSENTING OPINION.

WOODSON, J.—Entertaining the views I do of this proceeding, in my judgment it would be improper for me, at this time, to express an opinion as to the merits of the case.

I am unable to agree with our learned Chief Justice and other of my associates as to the powers and duties of the Secretary of State in the premises. In my opinion the design of the Legislature, in requiring the petitions of the voters to be filed with the Secretary of State, was simply to make him the custodian of the petitions and other proceedings in initiative and referendum legislation, in the same manner as he is now the custodian of all the proceedings leading up to legislation to be enacted by the General Assembly of the State; and the question of their validity, as well as all laws enacted by the people in pursuance thereof, is no more addressed to the courts, until after their enactment, than are the proposed enactments of the Legislature. It is conceded by all that a proposed bill, however offensive it may be to the organic law of the State, pending in the Legislature, cannot be controlled by the courts prior to its enactment, for the obvious reasons, first, because the courts have no authority or jurisdiction over the Legislature; and, second, because the bill may never receive the sanction of that law-making power. And, in my opinion, the same is true of the initiative and referendum. The courts have no power or jurisdiction to control the action of the sovereign people in the enactment of laws; and they may re-

pudiate the proposed legislation submitted to them for ratification, which fact would obviate the necessity of all action on the part of the courts. To hold that the courts cannot control the people themselves in such legislation by a direct proceeding instituted against them, but that they can do so indirectly by controlling the action of the Secretary of State, who is but their representative, is to ignore that legal maxim which prohibits that from being done indirectly which may not be done directly.

The mere fact that the Initiative and Referendum Act provides that, in case the Secretary of State should refuse to file the petitions mentioned therein, etc., is no authority for holding that he possesses a judicial or discretionary power to pass upon their validity. In my opinion that provision of the act was inserted not for the purpose of vesting that power in him, but for the purpose of making it clear that he had no such power and could be compelled by the courts to file the petitions regardless of his opinion of their validity; otherwise, that provision of the act is meaningless, for the reason the courts already possessed the power, under the general laws of the State, to control the discretionary powers of the Secretary of State whenever he abused or unwisely exercised that discretion.

Since the adoption of the Initiative and Referendum Act there are two lawmaking powers in this State, namely, the people themselves and the Legislature; and the courts have no more power to control the action of the former than they have to control the action of the latter.

In my opinion it would be just as appropriate to pass upon the validity of or to construe a will when presented for probate as it would be to pass upon the validity of a law or any of its preliminary steps prior to its enactment.

I believe this proceeding is premature, and therefore dissent from the conclusion reached by my asso-

ciates, and express no opinion at this time touching the merits of the proceeding.

## ON MOTION FOR REHEARING.

PER CURIAM.—There is nothing new in the motion for rehearing in this case, with one exception. It goes over the questions argued at length by counsel in oral argument and in brief on file, all of which were fully gone over and considered by the court in the preparation of the opinions herein. The suggestions in support of the motion do urge, contrary to the argument of the distinguished counsel who closed the case for relator, that they never claimed that the Secretary of State was other than a ministerial officer. The argument was public and the opinion properly quoted counsel. In fact the cases relied upon were along the line that the Secretary of State was a part of the Legislature. There is, as above indicated, but one new subject. The suggestions, for what purpose we know not, urge that if this proposed amendment is in fact not an amendment but a legislative act, then the present proposed Prohibition Amendment is fatally defective. The proposed Prohibition Amendment has nothing to do with this case; no one has questioned the validity of that amendment; it is not before the court; however, it may be added that the question of prohibition is a subject-matter for amendment to the Constitution, as well as a subject-matter for the statutes, and we apprehend that possibly those interested have seen to it that the proposed measure was constitutional in character rather than legislative. In other words, the sale of liquor may be regulated permanently or temporarily. Where the sale is prohibited by law, the law passed by one Legislature may be repealed by the next. This in one sense gives the temporary or legislative character. When prohibited by the Constitution or organic law, it has a degree of permanency. It prohibits

later legislative action. It remains so until the makers of the organic law again speak.

Not so with the alleged amendment now before us. Its temporary character is written upon its face. In fact, as stated in the opinions, it is not and cannot be construed as a constitutional amendment.

This suggestion about the proposed Prohibition Amendment being the only new matter, the motion for rehearing should be and is overruled.

*Fox, C. J.*, and *Gantt, Burgess* and *Graves, JJ.*, concur in the foregoing; *Lamm, J.*, dissents; *Woodson, J.*, still adheres to views expressed in the opinion by him filed, and expresses no further opinion; *Valliant, J.*, absent.