Robert W. BUCHANAN, Sammy K. Carter, and David M. Lockton, Appellants,

v.

James C. KIRKPATRICK, in His Capacity As Secretary of State of the State of Missouri, Respondent,

Taxpayers Survival Association, Inc., Mel Hancock, Missouri Farm Bureau Federation, and C. R. Johnston, Intervenors.

No. 62564.

Supreme Court of Missouri, En Banc.

April 3, 1981.

Michael Lerner and Earl J. Engle, Kansas City, for appellants.

John Ashcroft, Atty. Gen., Christopher M. Lambrecht, Terry C. Allen, Asst. Attys. Gen., Jefferson City, for respondent.

Alex Bartlett, Jefferson City, James L. Robinett, Jr., Springfield, Forrest P. Carson and Cullen Coil, Jefferson City, for intervenors.

PER CURIAM.

This case is before us on appeal from the decision of the Circuit Court of Cole County refusing to enjoin the respondent, Secretary of State, from placing proposed Constitutional Amendment No. 5 (hereinafter referred to as "Amendment No. 5") on the November 4, 1980, election ballot. The present posture of the case results from a series of events and court challenges which began with the filing of the initiative petitions for this amendment with the secretary of state on July 4, 1980.[1]

The parties assert that we have jurisdiction by virtue of § 126.071, RSMo 1978.[2] Our jurisdiction to entertain this case comes from the fact that the constitutional validity of the amendment before us is under challenge. Mo.Const. art. V, § 3, as amended August 3, 1976.[3]

We take judicial notice of the fact that on November 4, 1980, Amendment No. 5 was approved by the people of Missouri by

---

1. Chronologically the events and court challenges may be described as follows:

 1. July 4, 1980—the initiative petitions were filed with secretary of state.
 2. September 3, 1980—secretary of state announced the measure would not be on the November 4, 1980, ballot because of withdrawal of 1178 signatures in the 6th congressional district.
 3. September 5, 1980—mandamus action commenced by *Missouri Farm Bureau, et al. v. Kirkpatrick*, to require secretary of state to replace the 6th congressional district signatures on the petitions.
 4. September 9, 1980—alternative writ of mandamus issued.
 5. September 11, 1980—Sixth District Committee for Reasonable Taxation, Inc. seeks leave to intervene in *Missouri Farm Bureau* case.
 6. September 15, 1980—Sixth District Committee files brief in *Missouri Farm Bureau* case.
 7. September 16, 1980—oral argument in *Missouri Farm Bureau* case.
 8. September 17, 1980—secretary of state certified this and three other constitutional amendments to be submitted to the voters.
 9. September 19, 1980—*Missouri Farm Bureau* case decided, Mo., 603 S.W.2d 947, making alternative writ peremptory and ordering respondent to replace signatures. Motion of Sixth District Committee to intervene denied.
 10. September 24, 1980—present appellants, as plaintiffs, file petition in this Court for writ of mandamus compelling secretary of state to remove measure from the ballot (Case No. 62514).
 11. September 29, 1980—court enters order denying petition for writ of mandamus in case No. 62514 "without prejudice to subsequent litigation of issues not mooted by the election."
 12. October 1, 1980—appellants file the present action in Circuit Court of Cole County.
 13. October 7, 1980—leave granted present intervenors to intervene in Cole County action.
 14. October 9, 1980—respondent files answer in Cole County case. Trial court denies petition for injunction.
 15. October 10, 1980—plaintiffs in case No. 62514 file motion for clarification of this Court's order of September 29, 1980.
 16. October 10, 1980—motion for clarification in case No. 62514 denied.
 17. October 17, 1980—notice of appeal in Cole County case filed in this Court. Motion for clarification filed in this court in *Missouri Farm Bureau* case. Motion for expedited appeal filed in this case.
 18. October 20, 1980—motion for clarification in *Missouri Farm Bureau* case overruled. Motion for expedited hearing of this appeal overruled.
 19. January 29, 1981—appeal in present case argued in this Court.

2. All references to ch. 125 or ch. 126 are to the Revised Statutes of Missouri, 1978. S.S.S.B. 658, Laws of Mo.1980, p. 284, has repealed these chapters and replaced them with ch. 116, RSMo Cum.Supp.1980.

3. Our order of September 29, 1980, together with our subsequent orders (see note 1, paras. 11, et seq. *supra*) in our opinion obligates our prompt hearing of this appeal. *See also Foremost-McKesson, Inc. v. Davis*, 488 S.W.2d 193, 196, (Mo. banc 1972), where we said, "by reason of the general interest and importance of the other questions in the case and need for adjudication at this level, that we will retain and decide the case...."

a vote of 1,002,935 to 807,187. We also take note of the fact that S.B. 192, repealing and reenacting § 52.420, RSMo 1978, designed for the primary purpose of creating a court test of one of the provisions of Amendment No. 5, has already been passed by the 81st General Assembly and signed into law by the Governor.[4]

There is a serious question as to whether there is an appealable final judgment in this case, or if there is, whether the same may have been mooted by the election thereby converting this into a declaratory judgment, in effect, originated in this Court. Because of our prior discretionary denial of appellants' petition for mandamus (see note 1, para. 11 *supra*) "without prejudice to subsequent litigation of issues not mooted by the election" and our refusal for reason of time constraints to expedite the hearing on appeal in this matter (see note 1, paras. 17 and 18 *supra*) and, because of the general interest in and the pressing need for determination of the issues presented, we have resolved all doubts in favor of proceeding with the case. We will not decline to rule upon the constitutionality of the amendment as our sister state Michigan, whose Headlee Amendment is the model for Amendment No. 5, has done on two occasions since its adoption, by reason of "factual and jurisdictional void." *In re Request for Advisory Opinion of Constitutionality of 1979 PA 57*, 407 Mich. 60, 62, 281 N.W.2d 322, 324 (1979) and *In re Request for Advisory Opinion of Constitutionality of 1979 PA 57*, 407 Mich. 506, 508, 286 N.W.2d 686 (1980).[5]

Questions were raised during argument as to whether certain procedural objections had been waived by reason of the fact that the election was held prior to this hearing. For the same reasons that we choose to proceed with this appeal we also state that no issues raised by appellants will be deemed waived, although some matters objected to prior to election may be judged by a different standard following the election.

We acknowledge that this posture of the case tends to leave the issues less clearly defined than we might otherwise prefer, but there is no misunderstanding of the basic issues before us.

The fundamental and basic issues here involved are:

1. Were there procedural defects in the initiative petition for Amendment No. 5 which would have justified enjoining its being placed on the ballot prior to election, or which would now justify our invalidating the election because of such defects?

2. Is Amendment No. 5 a validly adopted constitutional amendment?

We first examine the applicable provisions of the Missouri Constitution and the implementing statutes.

Article I, § 1, provides:
That *all political power is vested in* and derived from *the people*; that all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole.
(Emphasis added.)

Article I, § 3, provides:
That *the people* of this state *have the inherent, sole and exclusive right* to regulate the internal government and police thereof, and *to alter and abolish their constitution and form of government whenever they may deem it necessary* to their safety and happiness, *provided such change be not repugnant to the Constitution of the United States.*
(Emphasis added.)

Article XII, § 2(b), provides in part:

---

4. S.B. 192, 81st General Assembly, repeals and reenacts § 52.420 by raising the salary of county collectors of second class counties by $100 per year. Both S.J.R. No. 1, 81st Assembly, and H.C.S. for H.J.R. No. 21, 81st General Assembly, if passed, would in effect submit to the voters the repeal of Amendment No. 5, and the adoption of amendments to the Constitution in lieu thereof.

5. The Michigan court, in unpublished opinions, also refused to rule on the constitutionality of the amendment before the election. *Hampton v. Governor*, No. 62138 (Mich. Oct. 24, 1978); *Ferency v. Secretary of State*, No. 61984 (Mich. Sept. 11, 1978).

All amendments proposed by the general assembly or by the initiative shall be submitted to the electors for their approval or rejection by official ballot title as may be provided by law. . . . *No such proposed amendment shall contain more than one amended and revised article of this constitution, or one new article which shall not contain more than one subject and matters properly connected therewith. . . .*

(Emphasis added.)

Article III, § 49, provides:

*The people reserve power to propose and enact or reject laws and amendments to the constitution by the initiative,* independent of the general assembly, and also reserve power to approve or reject by referendum any act of the general assembly, except as hereinafter provided.

(Emphasis added.)

Article III, § 50, provides in part:

*Petitions for constitutional amendments shall not contain more than one amended and revised article of this constitution, or one new article which shall not contain more than one subject and matters properly connected therewith,* and the enacting clause thereof shall be '*Be it resolved by the people of the state of Missouri that the Constitution be amended*'.

(Emphasis added.)

Article III, § 51, provides in part:

The initiative shall not be used for the appropriation of money other than of new revenues created and provided for thereby. . . .

Chapter 126, which contains the implementing statutes, sets forth the main procedural requirements which requirements for the sake of brevity are summarized.

1. Section 126.031, prescribes the form and format of the petition. *See also* Mo. Const. art. III, § 50.

2. Each petition shall contain signatures from only one congressional district. Section 126.041.

3. Each petition must contain a full text copy of the amendment. Section 126.041; Mo.Const. art. III, § 50.

4. Petitions must be signed by eight percent of voters in each of two-thirds of the congressional district. Section 126.051; Mo. Const. art. III, § 50.

5. Section 126.061 prescribes the form of the circulator's oath.

6. Section 126.081 provides for the attorney general to formulate the official "ballot title" which is to be voted upon in the election. *See* Mo.Const. art. XII, § 2(b).

7. Section 126.151 states qualifications for signers, with penalties. *See* Mo.Const. art. III, § 50.

8. Two sections make provision for court tests of the legal sufficiency of initiative petitions. Section 126.071 provides that if the secretary of state refuses to certify or file petitions, the sponsors may go to the Circuit Court of Cole County for mandamus to compel certification and filing. It is also provided that upon showing that any petition is not legally sufficient, the court may enjoin the certification and printing upon the ballot of the amendment. Provision is made for the expediting of appeals.

Section 126.081.5 provides that any citizen dissatisfied with any official ballot title or fiscal note may appeal to the Circuit Court of Cole County by petition within 10 days after its preparation by the attorney general.

It is clear that the framers of our Constitution intended that the Constitution be a permanent and abiding instrument allocating and defining the powers of our government.

In *State ex rel. Halliburton v. Roach*, 230 Mo. 408, 130 S.W. 689 (1910), this Court stated:

Constitutional provisions and amendments to the Constitution relate to the *fundamental* law and certain *fixed first principles* upon which government is founded. . . . The purpose of constitutional provisions and amendments to the Constitution is to prescribe the *permanent framework* and a uniform system of government, and to assign to the different departments thereof their respective

powers and duties.... "The very term 'constitution' implies *an instrument of a permanent and abiding nature, . . .*"
230 Mo. at 433, 130 S.W. at 694, *quoting, Livermore v. Waite*, 102 Cal. 113, 118, 36 P. 424, 426 (1894) (emphasis added).

It is equally clear that the framers of our Constitution recognized the inherent right of the people to amend their Constitution when in Article I, § 1, they stated, "That all political power is vested in and derived from the people . . ." and in Article I, § 3, "That the people . . . have the inherent, sole and exclusive right . . . to alter and abolish their constitution and form of government..." and in Article III, § 49, that "The people reserve power to propose and enact . . . amendments to the constitution by the initiative. . . ."

Inherent in the power of the people to "alter", "amend", or "abolish" their Constitution is the power and right to amend wisely or unwisely.

Our power to judge the wisdom of the people in adopting Amendment No. 5 was most clearly and succinctly stated by this court in 1896 in the case of *Edwards v. Lesueur*, 132 Mo. 410, 33 S.W. 1130 (banc 1896), when this Court stated:

The power—or, rather, the want of power—in the courts to review the policy or wisdom of constitutional amendments is thus expressed by Mr. Justice Brewer[6] (then of the supreme court of Kansas) in Prohibitory Amendment Cases, 24 Kan. 709. 'But questions of policy are not questions for the courts. They are wrought and fought out in the legislature, and before the people. Here the single question is one of power. We make no laws, we change no constitutions, we inaugurate no policy. When the legislature enacts a law, the only question which we can decide is whether the limitations of the constitution have been infringed upon. When a constitutional amendment has been submitted, the single inquiry for us is whether it has received the sanction of popular approval, in the manner prescribed by law. So

that, whatever may be the individual opinions of the justices of this court as to the wisdom or folly of any law or constitutional amendment, and notwithstanding the right which, as individual citizens, we may exercise, with all other citizens, in expressing, through the ballot box, our personal approval or disapproval of proposed constitutional changes, as a court our single inquiry is, have constitutional requirements been observed, and limits of power been regarded? We have no veto.'
132 Mo. at 434, 33 S.W. at 1133, *quoting, Prohibitory Amendment Cases*, 24 Kan. 700, 706 (1881) (footnote added). *See also Marsh v. Bartlett*, 343 Mo. 526, 539, 121 S.W.2d 737, 744 (banc 1938).

Ours is the task of weighing and balancing two contradictory and competing concepts—the need for a stable, permanent organic law versus the inherent right of the people to alter or change that organic law—and to make the final determination as to whether or not this constitutional amendment has been validly adopted by the people. *State ex rel. Board of Fund Commissioners v. Holman*, 296 S.W.2d 482, 484 (Mo. banc 1956); *Moore v. Brown*, 350 Mo. 256, 263, 165 S.W.2d 657, 659–60 (banc 1942); *Gabbert v. Chicago, R. I. & P. Ry. Co.*, 171 Mo. 84, 97–98, 70 S.W. 891, 894 (banc 1902); *Edwards v. Lesueur, supra*, 132 Mo. at 432–35, 33 S.W. at 1133; *State v. McBride*, 4 Mo. 303, 306–08 (1836).

Both the Missouri Constitution and the implementing statutes indicate that the drafters of both were aware of and sought to resolve these competing concepts of permanency of the Constitution versus the right of the people to make amendments thereto. Both attempted to set up safeguard procedures relating to the initiative process. All of these procedural safeguards are designed either, (1) to promote an informed understanding by the people of the probable effects of the proposed amendment, or (2) to prevent a self-serving faction from imposing its will upon the people without their full realization of the effects

---

**6.** Justice David J. Brewer, United States Supreme Court 1890–1910.

of the amendment. The procedural safeguards are all designed to assure that the desirability of the proposed amendment may be best judged by the people in the voting booth.

It is of interest to note that at no place in either the Missouri Constitution or in the implementing statutes is any court granted the power to enjoin an amendment from being placed on the ballot upon the ground that it would be unconstitutional if passed and adopted by the voters. *Moore v. Brown*, 350 Mo. 256, 264, 165 S.W.2d 657, 660 (banc 1942). It is also with some interest that we note that we have not been presented with nor have we found a Missouri case where a constitutional amendment has actually been set aside following its adoption by the people.

■ Since the amendment has already been adopted and the people have demonstrated their will, this Court's duty is not to seek to condemn the amendment, but to seek to uphold it if possible. *Gabbert v. Chicago, R. I. & P. Ry. Co.*, 171 Mo. 84, 70 S.W. 891, 895 (banc 1902). *See* 16 Am. Jur.2d *Constitutional Law* § 56.

It is in this background that we are called upon to examine both the procedures followed by the proponents of Amendment No. 5 in getting it on the ballot and to examine the substantive content of the amendment in order to answer the ultimate question of whether or not Amendment No. 5 constitutes a valid amendment to the Missouri Constitution.

### I

■ Appellants, both before and following the election, have objected to the form or format of the petitions upon the ground that they contained extraneous matters such as graphs and statements constituting advertising and bally-hoo in favor of adoption of the amendment. Other than for the extraneous advertising, the general format of the petitions appears to be in substantial compliance with the requirements of Mo.Const. art. III, § 50, and §§ 126.031 and 126.061.

We do not condone either deviation or variation from, or addition to either the requirements of the Constitution and implementing statutes or the statutory forms suggested therein and we would caution those who would use the initiative in the future against indulging in similar practices of including extraneous materials. We do not believe, however, that in this case the Missouri citizenry, accustomed as they are to seeing and reading advertising, were either so confused or were so prejudiced by the advertising graphs and statements, as to justify our invalidating the amendment and overriding the will of the people as expressed by their adoption of the amendment.

### II

■ Appellants have denominated as substantive their objection that the petitions encompass more than a single subject and have denominated as procedural,[7] their objection that the title upon the petitions did not fairly state the subject of the amendment.

Mo.Const. art. III, § 50, provides the safeguard against petitions containing "*more than one subject and matters properly connected therewith.*" (Emphasis added.) Section 126.081 sets forth the procedures for the secretary of state to request the attorney general to prepare and draft the ballot title and subsection 5 of the same statute authorizes anyone "dissatisfied" with the title to resort to the courts. Ei-

---

7. In *Moore v. Brown*, 350 Mo. 256, 165 S.W.2d 657 (banc 1942) indicates that an alleged defect is substantive if it relates to a requirement applicable to all constitutional amendments whether initiated by convention, legislative resolution or by initiative petitions. The requirement that any amendment be limited to a single subject matter and the requirement that any amendment be contained within a single article were therefore substantive in nature. 350 Mo. at 267, 165 S.W.2d at 662. Objections to procedural defects are normally waived if not raised prior to election, *State v. Burns*, 351 Mo. 163, 174, 172 S.W.2d 259, 265 (1943), objection to substantive defects are not. Since no procedural objections are here being treated as waived the distinction is of no special significance.

ther of these matters is reviewable by the courts prior to election. We address these issues together because the scope or breadth of Amendment No. 5 and the fairness of the title which describes the scope or breadth of the amendment are so interrelated.

 Generally stated, the central purpose of Amendment No. 5 is to limit taxes by establishing tax and revenue limits and expenditure limits for the state and other political subdivisions which may not be exceeded without voter approval. Amendment No. 5 is popularly described as "the tax and spending lid" amendment, words which also reflect its central purpose. To accomplish the central purpose, the amendment authorizes certain formulas for establishing the limits and provides a method for the repayment of taxes collected in excess of the limit. The amendment further seeks to prohibit the state from avoiding the defined limit or limits by the shifting of governmental responsibilities or the shifting of responsibility for payment for either existing or newly created governmental responsibilities. Provision is made for emergencies. Provision is made in section 23 of the amendment to give taxpayers and political subdivisions standing to enforce the amendment in the courts.[8]

8. Standing focuses on a party's " 'personal stake in the outcome of the controversy.' " *Sierra Club v. Morton*, 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972), *quoting, Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Standing is an aspect of justiciability which focuses on the party rather than the issues he wishes to have adjudicated. *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).

Subject matter jurisdiction is a different matter, as pointed out earlier herein. It is present if "a complaint states a case belonging to a general class over which the authority of the court extends. . . ." *Corning Truck & Radiator Serv. v. J.W.M., Inc.*, 542 S.W.2d 520, 527 (Mo. App.1976). A provision conferring standing does not confer subject matter jurisdiction when the latter does not otherwise exist. An individual who is the victim of a breach of contract has standing to bring suit for damages resulting therefrom, but that does not mean he can commence his action in this Court. Our jurisdiction is set forth in Mo.Const. art. V, §§ 3 and 4, which do not extend to suits to enforce the provisions of Mo.Const. art. X.

The official ballot title prepared by the attorney general provided:

Limits state taxes except for yearly adjustments based on total incomes of persons in Missouri or emergencies; prohibits local tax or fee increases without popular vote. Prohibits state expansion of local responsibility without state funding. No savings or costs to the state or local governments can be determined because of the definitions, formula provisions and the exceptions allowed in the proposal.

The title which appeared on the petitions states as follows:

An Amendment to the Constitution of the State of Missouri amending Article X of the Constitution relating to taxation, including but not limited to, limitations on taxation and governmental expenditures and the effectuation of such purpose.

Both the official title and the petition title appear on all notices required to be published by the secretary of state. The official ballot title was never questioned pursuant to § 126.081.

 Article XII § 2(b) of the Constitution states that "No such proposed amend-

Therefore, we note that despite § 23 of the amendment, this Court has no original jurisdiction of suits which seek to enforce the provisions of the amendment. The provision purporting to place jurisdiction of such suits in this Court is not essential to the efficacy of the amendment. If eliminated the remainder is still complete in itself and sufficient to accomplish the purpose for which it was adopted. It is not a provision without which the voters would not have adopted the amendment and without which the amendment would be incomplete and unworkable. *Labor's Educational & Political Club-Independent v. Danforth*, 561 S.W.2d 339, 350 (Mo. banc 1978); *State ex rel. State Board of Mediation v. Pigg*, 362 Mo. 798, 244 S.W.2d 75 (banc 1951). In short, the provision, which is ineffectual with respect to suits being filed in this Court for the reasons earlier stated, is severable. *See State ex rel. State Hwy. Comm. v. Thompson*, 323 Mo. 742, 751, 19 S.W.2d 642, 645 (banc 1929). Neither dissenting opinion takes issue with the fact that the provision is clearly severable. We note further that Mo.Const. art. V, § 14, already gives the circuit courts "original jurisdiction over all cases and matters, civil and criminal."

ment shall contain . . . more than one subject *and matters properly connected therewith.*" (emphasis added). We are unable to perceive how it can be successfully argued that any of the sections of the amendment are not "properly connected" with the central or primary purpose of the amendment *to limit taxes and governmental expenditures.* So long as the state has the unlimited power to authorize political subdivisions to assume governmental responsibilities and to tax to pay therefor, there could be no effective limitation on total taxes and spending within the state. We cannot say that those sections relating to political subdivisions deal with separate subjects. They are subjects not only properly, but vitally connected with the central or primary purpose of the amendment to control taxes and expenditures. The same is true of provisions relating to the repayment of excess revenues collected and provisions relating to standing in court to enforce the act. All of these items are properly connected to the single controlling purpose of the amendment: to limit taxes and governmental expenditures within the state of Missouri. In *Marsh v. Bartlett, supra,* it was argued that "control, management, restoration, conservation and regulation of bird, fish, game, forestry and all wildlife resources of the State" as provided for in Mo.Const. art. IV, § 40(a), involved several different subjects. We found no difficulty in holding that all of these matters were "properly connected" with the central purpose of "conservation" thereby making possible the creation of the Missouri Department of Conservation as we know it today. We find it no more difficult to say that all sections of Amendent No. 5 are "properly connected" with its central purpose of limiting taxes and governmental expenditures within Missouri.

▇ Likewise, an examination of the title of the petitions before us and the provisions of the amendment disclose that the title does give adequate notice of the subject of the amendment.

In *Union Electric v. Kirkpatrick,* 606 S.W.2d 658 (Mo. banc 1980), we held that:

[i]f the title gives adequate notice, the requirement is satisfied. However, even a liberal construction as to the adequacy thereof requires that the 'subject of the act' be evident with a sufficient clearness to give notice of the *intent* and *purpose* thereof to those interested or affected by the proposal. It is not required that the title set out 'details' of the contents of the proposal. [citations omitted]. More recently, it was said that: 'The ability of the voters to get before their fellow voters issues they deem significant should not be thwarted in preference for technical formalities.' *United Labor Committee of Missouri v. Kirkpatrick,* 572 S.W.2d 449, 454 (Mo. banc 1978).

606 S.W.2d at 660, (emphasis in original).

In the case before us, the voter is made aware the petition deals with taxation and limits thereon, as well as on government spending and the carrying out of such purposes, and, as we have said earlier, there is no complaint about the ballot title, on which the electorate actually voted, and which likewise makes it plain the proposed amendment pertains to limitation of taxes and governmental expenditures in Missouri. There is, therefore, no basis for invalidating the amendment on these grounds.

### III

▇ Appellants next contend that the initiative petition did not list all the constitutional provisions being changed by the proposed amendment. This procedural requirement originated in *State ex rel. Halliburton v. Roach,* 230 Mo. 408, 130 S.W. 689 (banc 1910). In the *Halliburton* opinion, Judge Fox writing for the Court stated,

If [an amendment is] submitted through the initiative, manifestly that provision as contained in the initiative and referendum amendment that 'the petition shall include the full text of the measure so proposed' must be complied with. In other words, if it is truly an amendment to the Constitution, the full text of the amendment *and what provision of the Constitution it undertakes to amend must be embraced in the petition.*

230 Mo. at 436–37, 130 S.W. at 695, (emphasis added).

In *Moore v. Brown*, 350 Mo. 256, 165 S.W.2d 657 (banc 1942), this Court interpreted the *Halliburton* requirement as follows:

> We have just indicated the views that existing constitutional provisions may be amended or repealed by implication through an initiative amendment. But in any case such repeals are not favored, and there must be irreconcilable repugnance between the two. . . . All the more should this be true when such repugnancy must be pointed out in the abstract, and not in a pending controversy based on facts. Time alone can ferret out all the consequential and remote conflicts between statutes or constitutional provisions in all their implications. We therefore think the requirement in the *Halliburton* case, that the proposed amendment disclose the constitutional provisions it seeks to change, refers only to cognate provisions which are in direct conflict—as were the ones in that case.

350 Mo. at 269, 165 S.W.2d at 663.

*Moore* does not require the makers of an initiative petition to "ferret out" and to list all the provisions which could possibly or by implication be modified by the proposed amendment. It only requires them to list provisions which would be in direct conflict. This is a reasonable requirement because it would succeed in substantially bringing out the effect of the proposed amendment without placing an excessive burden on those seeking change by way of the initiative. Any amendment dealing with tax limitations is bound to have widespread effects, because money affects every aspect of state and local government. That does not mean an initiative petition must descend to the level of detail advocated by appellants. To make such a requirement would tend to stifle the constitutional initiative process. It is sufficient if the petition points out "cognate provisions which are in direct conflict." The Missouri Constitution does not require, as did the Michigan Constitution referred to in the *Moore* case, that along with the full text of the amendment there should be published " 'any existing provisions of the constitution which would be altered or abrogated thereby.' " 350 Mo. at 270, 165 S.W.2d at 664. There is no such requirement for our initiative provisions. That is not necessary in order to give the prospective signer a fair realization of what he is being asked to sign. He is interested in the broad aspects of the proposed amendment, not the minute details.

Appellants cite various constitutional provisions that will be changed or affected by the amendment. Nowhere do they allege, and nowhere do we see, any provisions not listed on the petitions that are in direct conflict with or are irreconcilably repugnant to the Constitution. Following the reasoning in *Moore*, we must rule against appellants on this point.

## IV

Appellants contend that Amendment No. 5 violates the constitutional prohibition that "The initiative shall not be used for the appropriation of money. . . ." Mo. Const. art. III, § 51. The specific section of the amendment complained of is found in section 21.

> Section 21. The state is hereby prohibited from reducing the *state financed proportion* of the costs of any existing activity or service required of counties and other political subdivisions. . . .

(Emphasis added.)

It is argued that this in effect appropriates money in advance. The key word is "proportion." The state shall not reduce its "proportion" of the cost of the activity. Nothing precludes the state from either abolishing or reducing the activity or service, so long as the state does not reduce its proportionate share as between itself and the political subdivision. It is the retaining of the proportions which prevents the avoidance of the expenditure limits by the shifting of the responsibility for payments. We find no merit in the allegation that Amendment No. 5 appropriates in contravention of the Constitution.

## V

Appellants contend that Amendment No. 5 is invalid because it is in actuality a legislative act and not a constitutional amendment, citing *State ex rel. Halliburton v. Roach*, 230 Mo. 408, 130 S.W. 689 (banc 1910). In *Halliburton* this Court held that constitutional amendments are by their nature a part of the permanent law of this state. The proposed initiative measure in *Halliburton* purported to redistrict senatorial districts for a period of time ending in 1920. On its face this initiative measure was to operate for a finite period of time. Because the initiative measure was temporary it was not a part of the permanent law of this state "and should not be submitted under the false cognomen of an amendment." *Marsh v. Bartlett*, 343 Mo. 526, 535, 121 S.W.2d 737, 741 (banc 1938). In the instant case, the language of Amendment No. 5 does not establish any temporal limits for its operation. Rather, the provisions of the amendment are such that they may become a permanent part of the law of Missouri.

## VI

The "inherent, sole and exclusive right" of the people to amend "alter and abolish their constitution and form of government" is expressly made subject to the provisions that "such change be not repugnant to the Constitution of the United States." Mo. Const. art. I, § 3.

It is neither alleged nor argued in this proceeding that Amendment No. 5 violates or is repugnant to the United States Constitution. We therefore are not required and do not choose to examine or rule on this issue.[9]

We conclude that there was substantial compliance with the provisions of the Constitution and the implementing statutes in the placing of Amendment No. 5 on the ballot where it was approved by the people, thereby becoming a validly adopted amendment to the Constitution of Missouri. The judgment of the circuit court denying appellants request that the secretary of state be enjoined from placing Amendment No. 5 on the ballot is affirmed.

BARDGETT, C. J., and DONNELLY, SEILER, WELLIVER and HIGGINS, JJ., concur.

RENDLEN, J., dissents in separate dissenting opinion filed and concurs in separate dissenting opinion of MORGAN, J.

MORGAN, J., dissents in separate dissenting opinion filed and concurs in separate dissenting opinion of RENDLEN, J.

RENDLEN, Judge, dissenting.

I respectfully dissent. It is clear, as discussed in the dissenting opinion of Morgan, J., that Proposition # 5 (the so-called Hancock Amendment) contemplates the refund of taxes only to a privileged class of taxpayers, while gathering such monies from all taxpaying citizens, including those less fortunate who pay substantial portions, if not all, of their earnings for the purchase of necessities. The principal tax burden of the latter class is for sales taxes, gasoline taxes, license fees and similar excises, and yet members of that class are denied, by Proposition # 5, due process and equal protection of the laws guaranteed by Fifth and Fourteenth Amendments to the United States Constitution and Art. I, §§ 2 and 10 of the Missouri Constitution. This denial arises from Proposition # 5 because the excess from sales and similar taxes paid by members of the prejudiced class will not be refunded proportionately to those paying such monies, but instead such *excess sales tax and similar excises* will be refunded to

---

9. In oral argument there was brief discussion of the fact that some have urged that section 18(b) relating to repayment of excess revenues hereafter collected might be violative of the equal protection and due process provisions of the U. S. Constitution. The argument is that the taxes or revenues would, for the most part, be taken from the masses (the poor) and returned to the rich who pay the income tax. We are unable to perceive how such a legal issue could arise prior to the existence of such an excess. Even then, evidence would be required to establish the degree of any alleged inequity and the reasonableness of the classification would have to be resolved.

only those persons, individuals and corporations, paying income taxes and in proportion to the amount of *income tax paid.* Members of the favored class will receive from the refund: (1) Their share of income tax monies, (2) Their share of the sales and other excise taxes refunded, and (3) (quite unfairly and without constitutional justification) Most, if not all, *refunds of sales tax and other excises* paid by the nonfavored taxpayers. It requires little imagination to foresee that the principal opinion's failure to deal with the problem will be interpreted as tacitly approving this invidiously discriminatory scheme, which requires dispensing of the refund monies of "sales taxpayers" to another class of Missourians, "income taxpayers," without the just compensation assured by Art. I, § 10, Missouri Constitution.

Art. I, § 3 of the Missouri Constitution, limiting the amendatory process, recognizes that the people of the State may alter their Constitution, conditioned, however, that "such change be not repugnant to the Constitution of the United States." Similarly, Art. VI of the United States Constitution mandates that it "shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." Proposition # 5 is patently repugnant to the Fifth and Fourteenth Amendments to the United States Constitution, and for that reason, I join the dissent of my brother, Morgan, J., who, addressing the issue *sua sponte*, properly decided that the proposition was invalid.

Turning to the briefed contentions on appeal, it is clear the trial court, denying the injunctive relief sought, erred on October 9, 1980, when it decreed that certain of plaintiffs' allegations (appellants here) had been ruled against them on the merits by this Court in its denial of their petition for mandamus on September 29, 1980, in Case No. 62514. Those issues, involving alleged constitutional defects which the trial court assumed we had decided, were:

(1) That the form of the initiative petition did not meet the standard prescribed in § 126.031, RSMo 1978;

(2) That the petition failed to set forth all integrally related sections of the Constitution that would be changed by the proposed amendment; and

(3) That the title on the initiative petition did not accurately and fairly state the subjects of the proposed amendment.

Without question, the trial court was mistaken, as this Court *did not* decide, by its September 29th order denying mandamus, the merits of any issue. This is recognized in the statement of the majority, that mandamus was refused on the basis of a "discretionary denial". Hence, at the very least, we should reverse and remand for proper consideration of those issues framed when the trial court made its erroneous ruling on October 9, 1980, *prior to the election.* Further, in this suit for injunction, our review is limited under Rule 73.01 and *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), to an inquiry of (1) whether there is substantial evidence to support the trial court's action, and (2) whether the trial court erroneously declared or applied the law. There was *no evidence* to support the trial court's ruling as to issues mentioned above; instead, the evidence (the judgment of this Court discretionarily refusing mandamus September 29, 1980) squarely affronts the trial court's determination that the issues were *res judicata.* However, despite the mandate of Rule 73.01 as interpreted by this Court in *Murphy v. Carron, id.,* the majority ignores the trial court's error and treats the cause as if this body were a trial court with general original jurisdiction, authorized to receive and decide in the first instance petitions for injunction, and then, rendering a de novo determination, (without mention of the trial court's action) enters in effect a judgment "affirming" the trial court. This unwarranted ad hoc procedure is further aggravated when the principal opinion indulges a presumption of validity to sustain Proposition # 5 and to uphold the manifestly erroneous decision of the trial court.

In my view, the problem has been subtly warped and attention diverted from the threshold question, which, simply is: Was there compliance with the requirements of the amending process? To amend the Missouri Constitution, proponent must comply with the amending process prescribed by our Constitution and laws. It is not enough to say that the people have the right to change the Constitution and, because an election was held with the issue on the ballot, the discussion is effectively closed. Further, it begs the question to state (as is repeatedly suggested by the majority) that passage in an election creates a presumption of validity which helps satisfy the requirements of the amendatory process. This fallacious presumption of the majority faultily stems from the cited case, *Gabbert v. Chicago*, 171 Mo. 84, 70 S.W. 891 (Mo. banc 1902), which involved constitutional challenges *raised after an election* was held. Here, however, the issues were raised and ruled *prior to election* and we, on this appeal, should review only the trial court's action for error. It is indefensible to introduce a new fact, not existing at the time of the trial court's judgment, and employ it to either uphold or reverse the judgment.

The issues are: (1) Was the amending process properly followed? I submit it was not. (2) Should a presumption of validity be raised to protect Proposition # 5? I submit it should not.

To be sure, the people may amend the Constitution by *initiative*, but to safeguard this process and protect against abuse by private interests seeking to impose their will on an unsuspecting public, the framers of our Constitution and the legislature by implementing statute provided the proper manner therefore to insure a true exercise of the people's will. The point is well stated in *Edwards v. Lesueur*, 132 Mo. 410, 33 S.W. 1130, 1133 (Mo.banc 1896), cited by the majority, page 11. There, referring to challenges arising *after an election had been held*, the Court said:

When a constitutional amendment has been submitted, the single inquiry for us is whether it has received the sanction of popular approval, *in the manner prescribed by law*. (Emphasis added).

Most certainly, we should examine whether the amendatory process was followed at the critical stages, *in the manner prescribed by law*, in this case involving challenges to that process raised *before* the election.

I

The organic law and implementing statutes are designed to prevent submission of a carefully packaged or neatly camouflaged proposal containing multiple subjects not easily perceived as such nor readily unraveled by the electorate. In this connection, our Constitution carefully confines the manner for its amendment. Art. XII, § 1 provides

this Constitution may be revised and amended only as therein provided,

and Art. XII, § 2(b) provides that no proposed amendments submitted through the initiative process

shall contain more then one amended and revised article of this constitution, or one new article which shall *not contain more than one subject* and matters properly connected therewith. (Emphasis supplied).

That subsection further makes provision for situations, such as here, in which more than *one subject* is offered for adoption, requiring those subjects be placed in *different amendments* to "enable the electors to vote on each amendment *separately*." (Emphasis added). This Court has condemned the practice of submitting two subjects jointly to the voter, characterizing it as a species of legal fraud, for it compels the voter, in order to obtain what he honestly desires, to cast his ballot for something which he does not understand or in truth want. *State v. Holman*, 296 S.W.2d 482 (Mo.banc 1956). The proposed constitutional change, containing more than 1,300 words is in the nature of a constitutional revision, rather than a mere amendment, with its nine sections, arguably containing six subjects: (1) Taxation lid (§§ 16, 17, and 18) upon State Government; (2) Spending lid (§§ 18, 19 and 20) upon State Government; (3) Di-

rective dictating the manner (§ 21) in which the funds must be spent by State Government; (4) Taxation lid (§ 22) upon local governments; (5) Limitation upon local governments (§ 22) in obtaining revenues based upon assessments and property; and finally, (6) A novel grant of original jurisdiction to the Supreme Court, thus amending Art. V, §§ 3 and 4, Mo.Constitution. The sixth subject appears in the Proposition's § 23 which provides that the Supreme Court shall have original jurisdiction when the

> state is involved ... to enforce the provisions of sections 16 through 22, inclusive of this article and, if the suit is sustained, [the prevailing party] shall receive from the applicable unit of government his costs, including reasonable attorneys' fees in maintaining such suit.

This not only alters the Court's original *subject matter jurisdiction* by amending Art. V, §§ 3 and 4,[1] but imposes as constitutional law, payment by the "applicable unit of government" of the prevailing parties' costs and attorneys' fees. The latter hardly seems appropriate for inclusion in the Constitution, but more importantly, this dramatic alteration of our judicial system, including the questions of *subject matter jurisdiction*, costs, and attorney's fees, are changes which should only have been considered by the people as a *separate amendment*. The initiative petition proclaims that Proposition # 5 is amending Article X, the Taxation Article of the Constitution, but § 23 in fact drastically alters Art. V, the Judicial Article. It cannot reasonably

be said that this is merely "incidental to and necessarily connected with the control of spending and taxing in the State," as the majority would have us believe. Instead, it tells us those who prepared and promoted this petition were reluctant (or afraid) to submit this proposition altering the Supreme Court's jurisdiction in a separate amending proposal or to point out to the voters by reference in the initiative petition the constitutional provisions (Art. V, §§ 3 and 4) so markedly changed. We must be mindful that the initiative process misses the benefit of debate in the houses of our Legislature with input from concerned professionals familiar with the involved problems such as *subject matter jurisdiction* of courts. Sadly, this and other profound changes were neither separated for individual consideration by the people nor referenced as affecting or altering existing sections of the Constitution.

Thus Proposition # 5 required a voter to cast a single vote for several subjects as one, regardless of whether he approved all or only part of the proposal. For example, a voter may have favored taxing limits but have been opposed to the suggested change in the jurisdiction of the Supreme Court of Missouri. Yet, in the form proposed, he must take neither or both.[2] Such dilemmas, compounded by confusion of subjects, are precisely what Art. XII, § 2(b) of the Missouri Constitution is designed to prevent.

The proponent's failure to separate the included subjects for proper consideration by the electorate as prescribed by the

---

1. Art. V, § 3, provides as follows:
 The supreme court shall have exclusive appellate jurisdiction in all cases involving the validity of a treaty or statute of the United States, or of a statute or provision of the constitution of this state, the construction of the revenue laws of this state, the title to any state office and in all cases where the punishment imposed is death or imprisonment for life ...
 Art. V, § 4, provides as follows:
 1. The supreme court shall have general superintending control over all courts and tribunals. Each district of the court of appeals shall have general superintending control over all courts and tribunals in its jurisdiction. The supreme court and districts of

the court of appeals may issue and determine original remedial writs. Supervisory authority over all courts is vested in the supreme court which may make appropriate delegations of this power ...

2. Other examples suggest themselves. A voter not necessarily opposed to deficit spending but favoring a tax lid must have voted in favor of the deficit control in order to support the tax lid feature. Similarly, a voter in favor of a spending lid, but opposed to controlling *how* money may be spent was required to vote in favor of the directive as to how money is spent in order to vote in favor of the spending lid feature.

amending process renders the Proposition a nullity.

## II

It is required "that a proposed amendment by the *initiative* must *disclose* (emphasis added) what integrally related provisions of the Constitution it is changing, and that the initiative petition will be legally insufficient if that showing is not made." *Moore v. Brown*, 350 Mo. 256, 165 S.W.2d 657, 661 (Mo.banc 1942). The petition failed to reference or *disclose* in any manner numerous Constitutional provisions changed or repealed by Proposition # 5. The involved sections arguably number as many as 79 sections of the Missouri Constitution. The petition listed or *disclosed* on the bottom of the back page only 28 sections allegedly affected, thus depriving its signers of vital information regarding the Proposition's impact. The principal opinion sweeps this allegation of error aside with the generality that the *purpose* [3] of the amendment is to impose financial restraints on state and local government, and the many related sections (e. g., the Judicial Article V) are somehow not directly affected by nor in conflict with Proposition # 5. The majority fails to mention name or number of those sections [4] except to suggest the loose generality mentioned above. The people should not be called upon to vote for such constitutional change unless apprised by the petition of existing sections repealed or substantially altered by the proposal for change.

As previously noted, the presence of § 23 in Proposition # 5 renders it legally insufficient. The majority in footnote 8, page 13, virtually admits this § 23 conflicts with Art. V, §§ 3 and 4, stating that "Our jurisdiction is set forth in Mo. Const. art. V, §§ 3 and 4, which do not

extend to suits to enforce the provisions of Mo.Const. art. X" [§ 23 of Proposition # 5 becomes § 23 of Art. X]. Because the petition does not disclose this alteration of Art. V, the initiative must fail.

In addition, as discussed above, § 23 engrafts a subject other than taxation. Inclusion of this separate subject is abhorrent to Art. XII, § 2(b) and Art. III, § 50, and this, too, causes the Proposition to fail. The majority deals with these fatal flaws by first acknowledging that the jurisdiction of the Supreme Court of Missouri (as noted above) is indeed

> set forth in Mo.Const., art. V, §§ 3 and 4, which do not extend to suits to enforce the provisions of Mo.Const., art. X. (footnote 8, page 13.)

Stated differently, the majority concedes the present constitutional provisions (prior to § 23 of Proposition # 5), establishing the jurisdiction of this Court, do not permit the commencement of such actions here. The principal opinion proceeds further, stating,

> that despite § 23 of the amendment, this Court has no original jurisdiction of suits which seek to enforce the provisions of the amendment. (footnote 8, page 13.)

This, I submit, conclusively demonstrates that Proposition # 5 must fail as violative of the imperative of Art. XII, § 2(b), and Art. III, § 50, and the requirement of notice prescribed in *Moore v. Brown*, supra. Apparently acutely aware of these fatal flaws, the majority comments as follows in footnote 8:

> "In short, the provision [§ 23], which is *ineffectual* with respect to suits being filed in this Court for the reasons earlier stated, is severable. (Emphasis added).

Footnote 8 teaches several things: (1) § 23 indeed introduces a separate subject into the proposed amendment. (2) Art. V, §§ 3 and 4, though undisclosed by the petition,

---

**3.** *Purpose* is a misleading term in this context. The proper term from Art. XII, § 2(b) is "*subject* and matters properly connected therewith." (Emphasis supplied).

**4.** The appellants list the Constitutional sections they contend are altered, as follows: Art. I, §§ 18(b) and 27; Art. III, §§ 2, 7, 16, 17, 36, 37, 37(a), 37(b), 38, and 38(a); Art. IV, §§ 21, 25, 26, 27, 29, 30(b), 32(a), 34, 35, 37, 37(a), 40(a), 41, 42, 43(a), 47, and 48; Art. V, §§ 3 and 4; Art. VI, §§ 19(a), 20, 22, 24, 25(d), 25(e), and 27; Art. IX, §§ 2(a), 2(b), and 4; Art. X, §§ 2, 4(a), 4(b), 6(a), 6(b), 8, 10(c), 11(b), 11(c), and 11(d); and, Art. XII, § 6.

are in fact amended by the propositions of § 23. (3) To avoid a collapse of the proponent's (respondent's) position, the majority states in one breath that the people may speak their volition by altering the Constitution and have so spoken by amending Art. V, §§ 3 and 4, through proposed § 23, but then rejects that demonstration of the people's will, and by judicial fiat in footnote 8, holds § 23 of Proposition # 5 unacceptable. However, the flawed Proposition cannot be salvaged by this Court's unprecedented device of announcing that one portion is ineffectual (and thus implicitly excised) because it conflicts with a prior existing constitutional section on the subject. Nor can the Proposition be shorn up by an arbitrary announcement that § 23 is offensive to the majority's view of this Court's jurisdiction and, therefore, confers on the Court the power to arbitrarily accept only selected parts of Proposition # 5. After the vote of the people, by what authority may the majority declare one portion of the amendment "ineffectual" and thus severed, without declaring a failure in the amending process?

### III

It also appears that the proposed amendment violates Art. III, § 51, avowing that the "initiative shall not be used for the appropriation of money other than of new revenues created and provided for thereby...."

### IV

By presuming validity of the amendment, the principal opinion improperly penalizes appellants in the quest for adjudication of their claims challenging the validity of Proposition # 5. During the two months prior to the election, opponents of Proposition # 5 (now Amendment to Art. X) petitioned this Court in *three* different proceedings to decide their challenges to the Proposition. These efforts were made in timely fashion, prior to submission of the issue on the ballot in November, 1980. In *each* of these proceedings, this Court *refused* to consider their *claims*, without the benefit of opinion or exposition of rationale. The

harmful effects from these *inactions* have been compounded by the principal opinion's employment of a presumption that the recently suffraged amendment is valid. The three denials of requests to consider the issues occurred as follows:

*FIRST*: A petition for mandamus was brought by proponent of Proposition # 5 on September 5, 1980, praying that we order the Secretary of State to replace certain signatures on initiative petitions recently filed. This Court, in the exercise of its discretion, honored the proponent's petition, issuing the alternative writ on September 9, 1980. Opponents of the Proposition filed their motion to *intervene* on September 11, 1980, seeking to raise many of the issues now before the Court. This motion was denied September 19, but on that day the preliminary writ was made peremptory.

*SECOND*: On September 24, opponents (present appellants) filed their petition for writ of mandamus to compel the Secretary of State to *remove* the measure from the ballot. On September 29, this Court entered its order, without explanation, denying the *opponents' petition for mandamus*, adding only that the order was "without prejudice to subsequent litigation of issues not mooted by the election." Hence, in an *exercise of discretion* we entertained the proponent's petition for mandamus, but without reason given, we issued a "discretionary denial" of the *opponents'* petition. The issues were *then* matters of great importance and pressing concern ripe for determination, unhampered by any presumption of validity, but the Proposition's opponents were turned aside by our "discretionary denial" of the writ. The irony lies in the fact that we *now* consider the challenges because (according to the principal opinion, Page 9) "*of the general interest in and the pressing need for determination of the issues presented...*" (Emphasis ours). Though the pressing need and general interest were brought to our attention and urged upon us in September, and October, 1980, we remained unimpressed with that "need" and "general interest" and refused to consider the claims during those months.

*THIRD*: Still persevering, on October 1, 1980, the Proposition's opponents (appellants here) brought the present action for injunction in the Circuit Court of Cole County. Appellants' petition was denied there October 9, 1980. Because of the trial court's apparent uncertainty as to the meaning of this Court's brief order of September 29, 1980,[5] petitioners moved in this Court on October 10, for clarification of its enigmatic order, but that motion too was summarily denied here on the date of filing. On October 17, 1980, in probably their most critical attempt to bestir this Court, appellants (opponents) filed their notice of appeal from the Cole County Circuit Court's judgment, and an accompanying motion for expedited appeal. Three days later, this Court, again without opinion or comment, overruled that motion, refusing to hear the issues which appellants repeatedly sought to present, prior to the November election. The majority asserts our refusal to expedite the hearing on appeal was "for reason of time constraints." (page 9). This assertion is note borne out by the record. Thus, in spite of this Court's refusals to act in September and October of 1980, and notwithstanding this Court's order of September 29, 1980, stating that our action would not prejudice subsequent litigation of issues not mooted by the election, the majority now prejudices appellants for the so called *lateness* (the election has taken place) by raising a presumption of validity to defeat their claims.

The majority states that the same issues may "be judged by a different standard" (page 9) because they were not entertained prior to the election. This unfair presumption of validity should be raised only if cause for delay can be traced to appellants or if their suit had been commenced *after* the election. However, such is not the case. In this appellate review, we are bound to evaluate the trial court's actions as of the date they occurred, i. e., October 9, 1980, prior to the election. The trial court ruled the issues in the light of the facts then presented at a time when no election had occurred, and we must review the facts in the same light.[6]

### V

The initiative petition is the instrument containing the proposed amendment circulated for signatures among at least 8% of the voters in two-thirds of the Congressional Districts. That the electorate may be informed concerning the proposal submitted to them by the proponent's solicitors, the Legislature has provided by § 126.031, RSMo 1978, that such petitions shall be "substantially" in a prescribed form. The Legislature has formulated the exact language for an initiative petition, demonstrating an intent to circumscribe its permissible contents. The proponent overstepped the limits of this safeguard as to the petition's form. As stated by the majority, "All of these procedural safeguards are designed either, (1) to promote an informed understanding by the people of the probable effects of the proposed amendment, or (2) to prevent a self-serving faction from imposing its will upon the people without their full realization of the effects of the amendment." (Page 11). The petition, upon which the amending process is predicated, bears on its reverse side the proposed constitutional amendment, requiring sixty-four printed lines to display the fifteen sections and subsections containing more than 1,300 words. In addition to this voluminous *revision* of the Constitution (erroneously entitled an amendment), the petition bears extensive propaganda designed to sway the voter to the promoter's point of view. On the front of the petition, approximately 35% of the space (outside the area reserved for signatures) allocated to printing is devoted

---

**5.** In the mandamus proceeding, the petition was denied September 29, 1980, "without prejudice to subsequent litigation of issues not mooted by the election."

**6.** The majority opinion persists in penalizing appellants by stating that we will not "seek to condemn the amendment, but . . . seek to uphold it if possible", citing *Gabbert v. Chicago*, 171 Mo. 84, 70 S.W. 891, 895 (Mo.banc 1902). Page 12. This statement of decisional law is inapposite because in *Gabbert*, the validity was challenged *after* the election.

to advertising copy. On the back, more than 22% of the area allocated printed matter is devoted to such material, including charts and more hard-sell copy. This form richly deserves the following admonishment of the majority: "we would caution those who would use the initiative in the future against indulging in similar practices of including extraneous materials." (Page 12).

7. See appendix I for a copy showing the front and back of the petition.

Such variations from the form prescribed in § 126.031, RSMo 1978, not only deserve the court's admonishment, but in my view are sufficient to declare the petition in noncompliance and insufficient under the law to support the proposal's certification by the Secretary of State for inclusion on the ballot.[7]

## APPENDIX I

**STATE & LOCAL TAXES
VS
MISSOURI PERSONAL INCOME**

SOURCES: *Missouri Public Expenditure Survey*

**The Gaps Are Getting Wider!**

# STOP

### THIS
### UNCONTROLLED
### SPENDING

In just ten years, state and local taxes have increased twice as fast as the people's ability to pay (their personal income).

During the same ten years, state employment has increased over 8 times faster than the increase in state population.

Where is it going end? In a constitutional tax and spending limitation amendment!

### SIGN THIS PETITION
### VOTE YES IN NOVEMBER

**STATE EMPLOYEES
VS
STATE POPULATION**

SOURCES: *Missouri Public Expenditure Survey*

### PROPOSED CONSTITUTIONAL AMENDMENT
— Title —

An Amendment to the Constitution of the State of Missouri amending Article X of the Constitution relating to taxation, including but not limited to, limitations on taxation and governmental expenditures and the effectuation of such purpose.

BE IT RESOLVED BY THE PEOPLE OF THE STATE OF MISSOURI THAT THE CONSTITUTION BE AMENDED.

Article X of the Constitution of Missouri is amended by adding nine new sections thereto, to be known as Sections 16, 17, 18, 19, 20, 21, 22, 23, and 24

Section 16. Property taxes and other local taxes and state taxation and spending may not be increased above the limitations specified herein without direct voter approval as provided by this constitution. The state is prohibited from requiring any new or expanded activities by counties and other political subdivisions without full state financing, or from shifting the tax burden to counties and other political subdivisions. A provision for emergency conditions is established and the repayment of voter approved bonded indebtedness is guaranteed. Implementation of this section is specified in sections 17 through 24, inclusive, of this article.

Section 17. As used in sections 16 through 24 of Article X:

 (1) "Total state revenues" includes all general and special revenues, license and fees, excluding federal funds, as defined in the budget message of the governor for fiscal year 1980-1981. Total state revenues shall exclude the amount of any credits based on actual tax liabilities or the imputed tax components of rental payments, but shall include the amount of any credits not related to actual tax liabilities.

 (2) "Personal income of Missouri" is the total income received by persons in Missouri from all sources, as defined and officially reported by the United States Department of Commerce or its successor agency.

 (3) "General price level" means the Consumer Price Index for All Urban Consumers for the United States, or its successor publications, as defined and officially reported by the United States Department of Labor, or its successor agency.

Section 18. (a). There is hereby established a limit on the total amount of taxes which may be imposed by the general assembly in any fiscal year on the taxpayers of this state. Effective with fiscal year 1981-1982, and for each fiscal year thereafter, the general assembly shall not impose taxes of any kind which, together with all other revenues of the state, federal funds excluded, exceed the revenue limit established in this section. The revenue limit shall be calculated for each fiscal year and shall be equal to the product of the ratio of total state revenues in fiscal year 1980-1981 divided by the personal income of Missouri in calendar year 1979 multiplied by the personal income of Missouri in either the calendar year prior to the calendar year in which appropriations for the fiscal year for which the calculation is being made, or the average of personal income of Missouri in the previous three calendar years, whichever is greater.

 (b). For any fiscal year in the event that total state revenues exceed the revenue limit established in this section by one percent or more, the excess revenues shall be refunded pro rata based on the liability reported on the Missouri state income tax (or its successor tax or taxes) annual returns filed following the close of such fiscal year. If the excess is less than one percent, this excess shall be transferred to the general revenue fund.

 (c). The revenue limitation established in this section shall not apply to taxes imposed for the payment of principal and interest on bonds, approved by the voters and authorized under the provisions of this constitution

 (d). If responsibility for funding a program or programs is transferred from one level of government to another, as a consequence of constitutional amendment, the state revenue and spending limits may be adjusted to accommodate such change, provided that the total revenue authorized for collection by both state and local governments does not exceed that amount which would have been authorized without such change

Section 19. The revenue limit of section 18 of this article may be exceeded only if all of the following conditions are met. (1) The governor requests the general assembly to declare an emergency; (2) the request is specific as to the nature of the emergency, the dollar amount of the emergency, and the method by which the emergency will be funded; and (3) the general assembly thereafter declares an emergency in accordance with the specifics of the governor's request by a majority vote for fiscal year 1981-1982, thereafter a two thirds vote of the members elected to and serving in each house. The emergency must be declared in accordance with this section prior to incurring any of the expenses which constitute the emergency request. The revenue limit may be exceeded only during the fiscal year for which the emergency is declared In no event shall any part of the amount representing a refund under section 18 of this article be the subject of an emergency request

Section 20. No expenses of state government shall be incurred in any fiscal year which exceed the sum of the revenue limit established in sections 18 and 19 of this article plus federal funds and any surplus from a previous fiscal year

Section 21. The state is hereby prohibited from reducing the state financed proportion of the costs of any existing activity or service required of counties and other political subdivisions. A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the general assembly or any state agency of counties or other political subdivisions, unless a state appropriation is made and disbursed to pay the county or other political subdivision for any increased costs.

Section 22. (a). Counties and other political subdivisions are hereby prohibited from levying any tax, license or fees, not authorized by law, charter or self enforcing provisions of the constitution when this section is adopted or from increasing the current levy of an existing tax, license or fees, above that current levy authorized by law or charter when this section is adopted without the approval of the required majority of the qualified voters of that county or other political subdivision voting thereon. If the definition of the base of an existing tax, license or fees, is broadened, the maximum authorized current levy of taxation on the new base in each county or other political subdivision shall be reduced to yield the same estimated gross revenue as on the prior base. If the assessed valuation of property as finally equalized, excluding the value of new construction and improvements, increases by a larger percentage than the increase in the general price level from the previous year, the maximum authorized current levy applied thereto in each county or other political subdivision shall be reduced to yield the same gross revenue from existing property, adjusted for changes in the general price level, as could have been collected at the existing authorized levy on the prior assessed value.

 (b). The limitations of this section shall not apply to taxes imposed for the payment of principal and interest on bonds or other evidence of indebtedness or for the payment of assessments on contract obligations in anticipation of which bonds are issued which were authorized prior to the effective date of this section.

Section 23. Notwithstanding other provisions of this constitution or other law, any taxpayer of the state, county, or other political subdivision shall have standing to bring suit in a circuit court of proper venue and additionally, when the state is involved, in the Missouri supreme court, to enforce the provisions of sections 16 through 22, inclusive, of this article and, if the suit is sustained, shall receive from the applicable unit of government his costs, including reasonable attorneys' fees incurred in maintaining such suit.

Section 24. (a). The provisions for voter approval contained in sections 16 through 23, inclusive, of this article do not abrogate and are in addition to other provisions of the constitution requiring voter approval to incur bonded indebtedness and to authorize certain taxes.

 (b). The provisions contained in sections 16 through 23, inclusive, of this article are self-enforcing; provided, however, that the general assembly may enact laws implementing such provisions which are not inconsistent with the purposes of said sections.

NOTICE: You are advised that the proposed constitutional amendment changes, repeals, or modifies by implication, or may be construed to change, repeal, or modify by implication, in addition to the provisions of the Constitution which are specifically added, the following provisions of the Constitution of Missouri - Article II; Sections 1, 38 (b), 46, 48 (a), 47, 48, and 51 of Article III; Sections 15, 22, 23, 24, 28, and 30 (e) of Article IV; Sections 18 (c), 18 (d), 19, 25, and 26 (f) of Article VI; Sections 1 (a) and 3 (b) of Article IX; and Sections 1, 4 (d), 10 (b), 11 (a), 11 (f), and 12 (a) of Article X.

JOHN HANCOCK, *John Hancock* Radar Drive, Lebanon, Missouri 65536 *(Sign your John Hancock to the Hancock amendment.)*

# MISSOURI NEEDS
# TAX LIMITATION

**YOU CAN MAKE IT HAPPEN!**

$

## FOR USE BY ELECTION AUTHORITY

| No. Signatures On Page | No. Signatures Verified |
|---|---|

Congressional District No. _____

Sheet _____

### VERIFICATION AFFIDAVIT

State of Missouri,
County of _____

I, _____
(Print your, petition carrier, name) being
first duly sworn say (that the following
person)

### INSTRUCTIONS FOR CIRCULATORS:

1. Your signature on this petition will help to give the citizens of Missouri the opportunity to vote in the fall election to limit government's ability to increase taxes.

2. Limit taxes to the current ratio of total personal income. (See Sec. 18)

3. Provides for tax refund if state tax revenue limit is exceeded.

4. If state requires programs of local government, state must pay the bill. (See Sec. 21)

5. Property taxes may not be increased above the current levy without voter approval. (See Sec. 22)

6. Local government must get voter approval before it can levy any new taxes. (See Sec. 22)

1. You must check and list the city or township in which you are registered to vote.

2. Signers of each petition **MUST** be of the same congressional district.

3. Married women **MUST** use their names as they are registered to vote.

4. Signatures **MUST BE** made in the presence of the circulator.

5. Ditto marks **MUST NOT** be used.

6. Circulator **SHALL NOT** sign the certificate prior to obtaining the last signature on the petition.

7. Circulator **MAY NOT** sign a petition that he circulates.

8. Partially filled petitions are legally valid and should be turned in.

9. Return petition as soon after completion as possible.

**RETURN PETITIONS TO:**
TAXPAYER'S SURVIVAL ASSOCIATION
M.P.O. BOX 6060
SPRINGFIELD, MISSOURI 65801

Void if Duplicated. Write for additional petitions.
CALL TOLL FREE — 1-800-492-4800

It is a felony for anyone to sign any initiative or referendum petition with any name other than his own, or knowingly to sign his name more than once for the same measure, or knowingly to sign such petition when he is not a qualified voter.

### INITIATIVE PETITION

To the Honorable James C. Kirkpatrick, Secretary of State for the State of Missouri:

We the undersigned, citizens and qualified voters of the state of Missouri, and the _____ congressional district, respectfully demand that the following proposed amendment to the constitution shall be submitted to the qualified voters of the state of Missouri, for their approval or rejection at the general election to be held on the 4th day of November, A.D. 1980, or at a special election called by the governor prior thereto, and each for himself says: I have personally signed this petition; I am a qualified voter of the state of Missouri, and the _____ congressional district; my street address (or rural route) and the name of the city, town or village where I live are correctly written after my name.

## PROPOSED CONSTITUTIONAL AMENDMENT
— Title —

An Amendment to the Constitution of the State of Missouri amending Article X of the Constitution relating to taxation, including but not limited to, limitations on taxation and governmental expenditures and the effectuation of such purpose.

BE IT RESOLVED BY THE PEOPLE OF THE STATE OF MISSOURI THAT THE CONSTITUTION BE AMENDED.

Section 16. Property taxes and other local taxes and state taxation and spending may not be increased above the limitations specified herein without direct voter approval as provided by this constitution. The state is prohibited from requiring any new or expanded activities by counties and other political subdivisions without full state financing or from shifting the tax burden to counties and other political subdivisions. A provision for emergency conditions is established and the repayment of voter approved bonded indebtedness is guaranteed. Implementation of this section is specified in sections 17 through 24, inclusive, of this article. (The full text of the proposed amendment appears on the reverse side of this petition.)

| NAME (Signer's Signature) | STREET ADDRESS | CITY, TOWN OR VILLAGE AND ZIP CODE | PHONE NUMBER |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |

Subscribed and sworn to before me this _____ day of _____, A.D. 19 _____.

signed this sheet of the foregoing petition, and each of them signed his name thereto in my presence; I believe that each has stated his name, street address and city, town or village correctly, and that each signer is a qualified (and registered) voter of the state of Missouri and of the _____ congressional district.

Signature of Notary Public _____

My commission expires: _____

(NOTARY SEAL)

| SIGNATURE OF AFFIANT (Person Obtaining Petition Signed) |
|---|
| ADDRESS |
| CITY |
| COUNTY |

I would reverse the judgment of the trial court, and because the issue of injunction is no longer viable, I would, for the reasons set out herein, declare the proposed amendment a nullity.

MORGAN, Judge, dissenting.

I respectfully dissent because the challenged amendment to the Missouri Constitution (adopted by way of Proposition 5) is violative of and totally inconsistent with the "equal protection" clause of the United States Constitution in that it sets the stage for collecting taxes both from the *rich* and the *poor* but refunding excesses thereof only to the *rich*. Even a casual inquiry as to the constitutionality of such a procedure dictates that the flagrant discriminatory classification thus created cannot stand.

The issue was not considered by the majority opinion presumably because it was not presented by the parties, but that approach does not discharge our duty. Although judges of a state court, our oath of office requires that we uphold the United States Constitution. As said in *Edwards v. Lesueur*, 132 Mo. 410, 33 S.W. 1130, 1133 (Mo. banc 1896): "The constitution is intended for observance by the judiciary, as well as other departments of government. The judges are sworn to support the constitution, and the provision for its amendment is as obligatory upon the courts as any other part of it."

While it is true that this Court's jurisdiction cannot be predicated upon the existence of a constitutional question not raised or preserved below, *Kansas City v. Graybar Electric Co.*, 454 S.W.2d 23 (Mo.1970), *Lang v. Callaway*, 134 Mo. 491, 35 S.W. 1138 (Mo.1896), it is equally true that when we already have original or appellate jurisdiction on other grounds, we may decide a constitutional question *sua sponte*. *City of St. Louis v. Butler Co.*, 358 Mo. 1221, 219 S.W.2d 372, 378–79 (Mo. banc 1949), and authorities cited therein.

On the question of the supremacy of the United States Constitution, we need quote only from the watershed case of *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405–06, 4 L.Ed. 579 (1819):

In discussing these questions, the conflicting powers of the general and State governments must be brought into view, and the supremacy of their respective laws, when they are in opposition, must be settled.

If any one proposition could command the universal assent of mankind, we might expect it would be this—that the government of the Union, though limited in its powers, is supreme within its sphere of action. This would seem to result necessarily from its nature. It is the government of all; its powers are delegated by all; it represents all, and acts for all. Though any one State may be willing to control its operations, no State is willing to allow others to control them. The nation, on those subjects on which it can act, must necessarily bind its component parts. But this question is not left to mere reason: the people have, in express terms, decided it, by saying, 'this constitution, and the laws of the United States, which shall be made in pursuance thereof,' 'shall be the supreme law of the land,' and by requiring that the members of the State legislatures, and the officers of the executive and judicial departments of the States, shall take the oath of fidelity to it.

The government of the United States, then, though limited in its powers, is supreme; and its laws, when made in pursuance of the constitution, form the supreme law of the land, 'any thing in the constitution or laws of any State to the contrary notwithstanding.'

In *Neal v. Delaware*, 103 U.S. 370, 26 L.Ed. 567 (1880), the Supreme Court examined a provision of the Constitution of the State of Delaware limiting the right to vote to white males only. Such provision was alleged to be violative of the fifteenth amendment to the Constitution of the United States. In sustaining this challenge, the Court said:

Beyond question, the adoption of the Fifteenth Amendment had the effect, in law, to remove from the State Constitu-

tion, that provision which restricts the right of sufferage to the white race .... The presumption should be indulged, in the first instance, that the State recognizes, as is its plain duty, an amendment of the Federal Constitution, from the time of its adoption, as binding on all of its citizens and every department of its government, and to be enforced, within its limits without reference to any inconsistent provisions in its own Constitution or Statutes.

*Id.* at 389–90, 26 L.Ed. 567.

Consistent therewith, this Court has recognized that if a provision of the Constitution of the State of Missouri is in conflict with the United States Constitution, it is void. *Household Finance Corp. v. Shaffner*, 356 Mo. 808, 203 S.W.2d 734 (Mo. banc 1947).

It is clear, therefore, that if Proposition 5 contravenes any part of the Constitution of the United States, it is utterly void, and this Court should so declare. A reading thereof reveals that the refund provision requires a pro rata refund of any excess state revenues. Section 18(b) says: "For any fiscal year in the event that total state revenues exceed the revenue limit established in this section by one percent or more, the excess revenues shall be refunded pro rata based on the liability reported on the Missouri state income tax (or its successor tax or taxes) annual returns filed following the close of such fiscal year. If the excess is less than one percent, this excess shall be transferred to the general revenue fund." The difficulty is that the section only gives refunds to those who have incurred a personal income tax liability, this despite the fact that all state tax revenues, including real and personal property taxes, personal or corporate income taxes, gasoline taxes and sales and use taxes, are considered in determining whether the state has collected excess revenue. It is clear, then, that Proposition 5, on its face creates a classification based solely upon wealth. Only those who earned enough money to incur personal income tax liability are eligible for a refund; those who do not make that much money will never receive a refund, despite the fact that they may have paid an untold amount of sales, property, use or other taxes. Thus, the amendment blatantly discriminates against the poor in favor of the rich.

Classifications based upon financial condition or wealth are suspect. *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Tate v. Short*, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971); *Williams v. Illinois*, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970); *McDonald v. Board of Election Commissioners' of Chicago*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1965); *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). The rule that statutes which create suspect classifications will be "strictly scrutinized" to determine whether they further a compelling state interest is so well established that citations are not necessary. It does not appear that *any* state interest that possibly might be served by Proposition 5 is justified by discriminating against a vast number of the citizens of this state. Some might argue that refunds will be given only to those who pay income taxes because those persons are easily identifiable, and it would be unduly burdensome to make refunds to all taxpayers, both large and small. But, is administrative convenience a reasonable justification for such blatant discrimination? I think not.

A situation substantially similar to the case at bar was presented in *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). During the period of 1959 to 1963, the California legislature passed statutes known as the Rumford and Unruh Acts which purported to make race discrimination in private real estate transactions unlawful. Thereafter, in 1964 the California electorate adopted Proposition 14 which amended the state constitution to prohibit any state agency from in any way limiting or controlling a land owner's discretion in renting or selling his land to whomever he chose. Proposition 14 was

challenged in the state courts as being violative of the Equal Protection Clause of the Fourteenth Amendment because it legalized private race discrimination. The California Supreme Court held that the amendment was indeed in conflict with the United States Constitution and struck it down. See: *Mulkey v. Reitman*, 64 Cal.2d 529, 50 Cal.Rptr. 881, 413 P.2d 825 (Cal.1966). The U.S. Supreme Court affirmed by holding that the mere authorization of race discrimination violated the fourteenth amendment.

In the instant case, the challenged amendment (Proposition 5) goes far beyond condoning or authorizing discrimination in violation of the "equal protection" clause of the United States Constitution. In fact, it affirmatively mandates that revenue personnel treat classes of Missouri citizenry differently; which is even more reprehensible because it takes from those sorely needing tax relief and gives to those who can afford not to receive a refund. The observation thus made is not a comment on the merits of the amendment, with which we are not to be concerned, but only to point up the glaring presence of an *unconstitutional* classification. Without being facetious, I would suggest that the scheme itself would have caused Robin Hood great consternation.